## EXCHANGE NATIONAL BANK OF TULSA et al. v. MARTIN, Adm'x.

No. 25037. May 28, 1935.

Joseph L. Hull and A. J. Kriete, for plaintiff in error Exchange National Bank of Tulsa.

William T. Rye, for plaintiff in error Drake Hawkins.

Carey Caldwell and Richard L. Wheatley, for defendant in error.

PER CURIAM. Nannie Caldwell, nee Nannie Martin, as administratrix of the estate of Jasper S. Martin, deceased, plaintiff below and defendant in error herein, sued Drake Hawkins, the owner of certain cattle, one of the defendants below and one of the plaintiffs in error herein, and the Exchange National Bank of Tulsa, owner of a chattel mortgage on the cattle, one of the defendants below and one of the plaintiffs in error herein, for the conversion of these cattle. Plaintiff below claimed an agister's lien on the cattle involved.

Judgment was rendered upon a verdict of a jury for $2,400 in favor of the plaintiff below and against each of the defendants below. Hawkins and the bank appealed.

Hawkins, the owner of the cattle involved, placed the cattle upon the lands of Jasper S. Martin in Craig county between April 10, and April 15, 1930. The bank financed Hawkins in the purchase of the cattle, and the cattle, at the time they were placed upon the Martin lands, were under a chattel mortgage to the bank to secure two notes aggregating $34,232.62, except there is evidence tending to show that the mortgage of the bank on 130 head of the cattle was signed May 5, 1930, after this 130 head had been placed upon the Martin land.

Martin died May 14, 1930.

The bank's mortgage, after describing the cattle, recited:

"All located 5 miles west of White Oak in Jasper Martin's pasture, Craig county, Oklahoma."

The chattel mortgage contained the following:

"For the purpose of obtaining the above credit, the mortgagor expressly represents and warrants to the mortgagee that all of the said property is owned by the said mortgagor and is free and clear of all liens and incumbrances, and is now in the exclusive

possession of the mortgagor, and in Craig county, Okla."

The mortgage further provided that the cattle could be sold at private sale and the proceeds applied to the mortgage indebtedness.

Martin, the owner of the land, being dead, the proof as to the terms of the contract between Martin and Hawkins was very unsatisfactory.

It is true that the evidence clearly shows that after the death of Martin the owner of the cattle was forced to expend money borrowed from the bank on the unsecured notes hereinafter mentioned in the care of the cattle, and that practically nothing more than the furnishing of land was done by the estate of Martin, but there was sufficient evidence from which the jury could find that the agreement between Martin and Hawkins was not a mere rental of pasture, but was such an agreement for personal service in caring for the cattle by Martin that an agister's lien would arise. The jury apparently so found.

Pursuant to the terms of the mortgage, and the arrangement between the bank and Hawkins, certain of the cattle were sold from time to time by Hawkins, the owner of the cattle, and the proceeds were delivered to, and applied by, the bank to the indebtedness secured by the mortgage, except the bank applied $1,100 to the payment of two notes from Hawkins to the bank, which were not secured by the mortgage, and $150 to a note given by Hawkins to the bank to evidence interest past due upon the mortgage indebtedness. The sales and payments were as follows: On July 5, 1930, $1,194.75; August 16, $2,117.41; August 21, 1930, $1,143.02; September 2, 1930, $8,844.74; September 11. $2,299.31; September 19th, $3,410.21; October 26, 1930, $917.67.

All of the remaining cattle were taken from the Martin place about October 15, 1930, and were shipped to Arkansas.

On November 6, 1930, Drake Hawkins sold all of his cattle to Mat Hawkins and the bank accepted the note and mortgage of Mat Hawkins for all sums due from Mat Hawkins to the bank and released Drake Hawkins.

There is no evidence that the plaintiff objected to the removal of the cattle from the Martin place, or that the owner of the cattle removed the same by stealth, and there is no evidence that the bank had any part in the removal of the cattle. The only act of the bank in this connection was that the bank permitted the owner of the cattle to sell the same free of the lien of the bank's mortgage.

The questions discussed are: The priority of the liens, first, as to the 130 head of cattle above mentioned; and, second, as to the remainder of the cattle: Did the bank consent to the services by the plaintiff in such a manner as to waive the priority of the bank's lien? The right of the bank to apply the proceeds of the sale of the mortgaged cattle to its unsecured indebtedness free of the agister's lien.

The bank further contends that Martin, the owner of the land, being an officer of another bank, requested the Exchange National Bank to handle the Hawkins account for it, and that Martin specifically waived any claim of lien as against the mortgage of the Exchange National Bank. Evidence amply sustaining this contention was introduced, and the Exchange National Bank contends that inasmuch as this evidence was produced by the plaintiff, the plaintiff is bound thereby. This contention is not good, for the plaintiff in order to make her case was forced to place an officer of the Exchange National Bank on the stand as her witness to prove the condition of the account between Hawkins and the bank, that is, to show that the bank had applied the proceeds of the sale of the cattle to the indebtedness from Hawkins to the bank. The evidence showing the request by Martin that the Exchange National Bank handle the account and the evidence showing a waiver by Martin of his lien was brought out in cross-examination over the objection of the plaintiff. This evidence was not admissible as it was not proper cross-examination, and, further, as it was a conversation between one of the principal officers of the bank and the deceased. It will be presumed that the witness, a principal officer of the Exchange National Bank, was more than a nominal stockholder in the absence of proof by the bank to the contrary.

1. Did the bank consent to the lien of the plaintiff? The law is well settled in this state that the consent of a mortgagee to the services for, and the furnishing of feed and pasturage for, cattle may be implied from facts and circumstances surrounding the transaction, and thereby the agister's lien which would otherwise have been junior will be made prior to the mortgage. Cather

et al. v. Spencer et al., 55 Okla. 511, 154 P. 1130.

The courts have gone far, and properly so, in implying consent by a mortgagee from facts and circumstances, but the mere recital in a chattel mortgage that the cattle are located upon the property of a third person when coupled with a warranty that the cattle are in the possession of the mortgagor and are free from lien, cannot be construed into the positive act of a consent.

2. Granting that 130 head of cattle were placed upon the lands of Martin prior to the time that the mortgage of the bank was executed, does the agister's lien of the plaintiff thereby become prior to the mortgage lien of the bank?

This is not, as are most of the reported cases, a possessory action between one claiming an agister's lien who retains possession of the animals, and one claiming a lien under a chattel mortgage. We are of the opinion that where a mortgagee has furnished the money to buy cattle, and pending the execution of the note and chattel mortgage the owner places the cattle upon the lands of a third party and in the chattel mortgage warrants that the owner is in possession of the cattle and that there are no liens, the mere fact that the mortgagee has notice that the cattle are upon the land of a third party does not make the lien of the landowner prior to the lien of the mortgage.

The mortgagee under such a situation is not compelled to believe that the owner of the cattle is making a false warranty. The only conclusion that could be drawn by the mortgagee would be that the relation between the owner of the cattle and the owner of the land was one purely of landlord and tenant. from which no lien would arise.

It is true that in Oklahoma, as between the owner of the cattle and the one claiming an agister's lien, possession is not necessary, but a different rule applies as to third parties.

In Hall v. Black, 93 Okla. 148, 220 P. 50, the court quotes with approval the following:

"An agister's lien is not, as between the parties or third persons having notice thereof, lost by change of possession not inconsistent with it and not under circumstances indicating an intent to waive, relinquish, or abandon it. * * * Continuous possession of the property is essential only as between the lienor and third parties, as between the immediate parties the lien may continue after change of possession."

The plaintiff in order to establish a lien must prove that the relation is more than that of landlord and tenant; that it is one in which possession of the animals is delivered to the agister for the agister's care. Under such relation it becomes the duty of the agister to see that the animals are not lost through the negligence of the agister.

The agister cannot be heard to say to a third person that the owner, who removes the animals without stealth, fraud or duress, did not receive them with the consent of the agister, merely because the agister was negligent and paid no attention whatever to the animals.

A chattel mortgage that is on record cannot be utterly disregarded by one who claims to be an agister.

In something over three months from July, 1930, the owner of the cattle removed cattle on at least seven different occasions of a total value of nearly $20,000, and about October 15th removed the remainder of the cattle and shipped them to Arkansas. The record does not show that the plaintiff ever made any complaint until the time of filing the petition in conversion, nearly eleven months after the last of the cattle were removed from the Martin land.

This is not the question of the waiver of a lien by the agister. The plaintiff permitted the owner of the cattle to have possession of them, and the bank, upon the strength of this possession by the owner, changed its position by releasing its mortgage as to these cattle.

3. Was the bank guilty of conversion in applying the proceeds of the sale of cattle covered by its mortgage to the liquidation of its unsecured debt?

One of the so-called unsecured notes was for about $150, but this was a note taken by the bank as collateral security for past-due interest upon the mortgage indebtedness. The application of the fund to extinguish this note was, in reality, the payment of interest upon the mortgage indebtedness and was a proper application by the bank. The situation of the bank as to the other two unsecured notes which totaled $1,100 is quite different.

The cattle mortgaged to the bank constituted a common fund for the liquidation of the lien of the bank and any other liens which might be junior. The holder of a junior

lien has the right to require the mortgagee to apply the proceeds of the mortgaged cattle to the liquidation of the bank's secured indebtedness, or to have the cattle released to the owner so that they might be applied to the liquidation of the junior lien.

This is not upon the theory that the mortgagee has notice of the junior lien, but upon the theory that the mortgagee knows that his mortgage is of record and is notice to the holder of junior liens, and that junior lienholders are entitled to act upon the assumption that the mortgaged chattels, in the case of animals, will be applied to the liquidation of the mortgage debt.

4. The bank alleges error in that the court, after the jury had manifested that it did not understand the instruction, and after the jury had stated that it did not understand the instruction, gave a supplemental instruction.

The bank cites John Foster v. William Turner, 1 P. 145, which is a Kansas case, and quotes from the case as follows:

"Of course, we think, there are cases where a jury after retiring might ask for further explanation or information, and where the court might rightfully give such explanation or information; but we do not think that the court would be justified in any case in giving another full, complete and different charge to the jury upon nearly all or even some of the material questions involved in the issues of the case. Of course, the court did not intend to give anything new in its instructions, or to state them differently from what it had previously done in its general charge; but still, we think, the subsequent instructions were more unfavorable to the plaintiff, than the general charge was. They were given in a way, as we think, to mislead the jury, and to leave the jury to infer that they must find something in favor of the defendant and against the plaintiff."

This is correct statement of the law.

The original instructions given by the court were very clear and should have been understandable to the jury.

The court, in the supplemental instruction, in a laudable anxiety to clear the minds of the jurors on the point which was not clear to them, did go rather far in reciting the elements involved in the case, but a careful reading of the supplemental instruction in connection with the original instruction, shows clearly that the supplemental instruction did not constitute a different charge to the jury on any material question involved in the case.

6. The jury in this cause returned a verdict against the codefendant Hawkins. The court directed the jury to retire and deliberate further. On further deliberation the jury returned a verdict against the Exchange National Bank for $2,000 and a verdict against Drake Hawkins for $500. After this verdict was brought into the court, the judge gave the supplemental instruction above mentioned, and thereafter the jury returned a verdict against the bank and against Hawkins for $2,400 each.

The bank objects on the ground that when the jury had returned its first verdict, it became functus officio and could not deliberate on the cause further.

Until the jury is discharged by the judge it is still acting as a jury in the cause,

The judgment as to the defendant Drake Hawkins is affirmed. The judgment of the trial court is reversed as to the Exchange National Bank of Tulsa and the cause is remanded for a new trial in conformity with the law set forth in this opinion. If, however, the plaintiff below, defendant in error herein, enters a remittitur to the sum of $1,100 as to the bank, the judgment against the Exchange National Bank for $1,100 will stand.

Reversed and remanded.

The Supreme Court acknowledges the aid of Attorneys W. A. Lybrand, J. R. Keaton, and Eugene Jordan in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Lybrand and approved by Mr. Keaton and Mr. Jordan, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was adopted.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BAYLESS, and GIBSON, JJ., concur.