LEGER MILL COMPANY, INC., and Sheffield Smith Elevator and Supply, Inc., Appellees,

v.

KLEEN–LEEN, INC., and First State Bank of Altus, Oklahoma, Appellants.

No. 46046.

Supreme Court of Oklahoma.

April 12, 1977.

---

**134**

Harbison & Weber, Altus, for appellee, Leger Mill.

Ryan Kerr, Altus, for appellee, Sheffield Smith.

McClelland, Collins, Sheehan, Bailey & Bailey, Oklahoma City, for appellant, Kleen-Leen, Inc.

Garrett & Harlan, Mangum, for appellant, First State Bank.

SIMMS, Justice:

Bob Scarbrough ventured into the swine breeding business [1] in October, 1969. In February, 1971, the business failed and this appeal results from a dispute between certain of his creditors regarding their priority in the proceeds from the sale of the swine.

Two creditors, Kleen-Leen, Inc., and First State Bank of Altus (Bank) had perfected their security interests in the swine by filing under the Uniform Commercial Code. On February 19, 1971, with Scarbrough's permission, they took possession of the 1094 remaining swine and sold them for $35,-384.82. Subsequently, they divided the proceeds between themselves; $23,000 to Kleen-Leen and $12,384.82 to Bank.

Two other creditors, Leger Mill Company, Inc. (Leger Mill), and Sheffield Smith Elevators and Supply, Inc. (Sheffield), brought action against Kleen-Leen and Bank for conversion of the swine, asserting priority by reason of "feedman's" liens under 4 O.S.

1971, § 192. Later, Leger Mill and Sheffield amended to allege that the secured creditors converted the proceeds upon which they had a first and prior lien for the amounts due for feed furnished to Scarbrough for the swine. Leger Mill (plaintiff) and Sheffield (cross-petitioner) sought judgment against the secured creditor defendants for the total amount of indebtedness owed them by Scarbrough. Leger Mill prayed for judgment in the amount of $16,-595.59 and Sheffield sought judgment for $8,982.19. All parties filed pleadings against all other parties. Although Kleen-Leen and Bank had conflicting claims in the proceeds, it was agreed that any question of priority between their claims would be determined, if necessary, by separate action.

The cause then proceeded to trial with Leger Mill and Sheffield as plaintiffs against Kleen-Leen and Bank.

The trial court held in favor of the feedmen, finding they had valid feeders' liens which were prior and superior to any right or claim of Kleen-Leen and Bank in the swine or proceeds. The Court granted feedmen judgments in the full amounts prayed for and also awarded them attorney's fees in the amounts of $3,000 to Leger Mill, and $1,500 to Sheffield under authority of 42 O.S.1971, § 176.

Secured creditors, Kleen-Leen and Bank, appeal contending that the trial court erred in holding the "feedman's" liens prior to their own secured interests and that the court erred in awarding feedmen attorney fees.

We reverse the trial court.

The relevant facts are these. In October, 1969, Bob Scarbrough entered into a contractual arrangement with Kleen-Leen whereby Kleen-Leen furnished swine breeding stock on a lease basis. Essentially, the contract provided that Kleen-Leen retained ownership of the original breeding herd and the progeny of the first farrowing. Scarbrough would then retain ownership of the progeny of subsequent farrowings subject

---

1. Together with Barry Shive, doing business as Navajo Farms.

to a first lien thereon by Kleen-Leen. Kleen-Leen filed its financing statement with the Jackson County Court Clerk on November 18, 1969, covering "all swine presently or hereinafter located" on lessee's farm. The first shipment of swine was delivered to Scarbrough in January, 1970, and, through subsequent shipments, a total of 322 hogs were delivered to Scarbrough. In February, 1971, when the repossession took place, Scarbrough was indebted to Kleen-Leen in the amount of $33,274.87.

It was undisputed that as part of its "management and feeding" program, Kleen-Leen required its producers, such as Scarbrough, to feed the swine Ralston Purina feed. It was also undisputed that the Ralston Purina Company owned 60% of the outstanding stock of Kleen-Leen.

Leger Mill was the authorized Ralston Purina dealer in Altus. Leger Mill began furnishing feed and feed supplement to Scarbrough in January of 1970, and continued to furnish him feed until February 15, 1971. As mentioned above, by February, 1971, Scarbrough owed Leger Mill $16,595.59 for feed supplied.

Sheffield began to sell Scarbrough grain for the hogs on July 11, 1970, and continued to furnish grain until February, 1971, at which time Scarbrough's account totaled $8,982.19.

Bank loaned Scarbrough $30,912.50 to finance his swine breeding venture. To secure the notes, Scarbrough executed a security agreement and financing statement covering "all sows, hogs and pigs now owned and hereinafter acquired . . . subject to Kleen-Leen lease agreement." The financing statement was filed in the Jackson County Court Clerk's office on September 11, 1970, and with the Court Clerk of Oklahoma County on September 14, 1970. By February, 1971, Scarbrough owed Bank $32,175.07.

The feedman's lien at issue here is found at 4 O.S.1971, § 192, and provides that:

"Any person, partnership, firm or corporation in this State, or in any border county of the adjacent States, furnishing or providing to the owner of such domestic animals any corn, feed, forage or hay, for the sustenance of such domestic animals, shall have a lien on said animals for the amount due for such corn, forage, feed and hay."

The narrow issue presented for our determination is whether these statutory liens take priority over security interests properly perfected under the Uniform Commercial Code.

We have held our feedman's lien to be non-possessory and not dependent on possession. *National Bank of Commerce v. McDaniel,* 71 Okl. 6, 174 P. 286 (1918).

The Uniform Commercial Code controls only the priority of certain possessory liens in relation to recorded security interests. 12A O.S.1971, § 9–104, provides:

"This Article does not apply

\* \* \* \* \* \*

(c) to a lien given by statute or other rule of law for services or materials except as provided in Section 9–310 on priority of such liens; \* \* \*."

12A O.S.1971, § 9–310, provides:

"When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise."

It is clear that the Uniform Commercial Code does not control the question of the priority between non-possessory liens and perfected security interests.

The secured parties, appellants here, contend that by the exclusion of non-possessory liens, the intent of the Code was to make them inferior in all instances to secured interests.

Appellees argue that even though non-possessory liens are not included in the Code's priority coverage, the stated purpose of § 9–310 to give priority to liens " . . securing claims arising from work intended to enhance or preserve the value of collater-

al" will be served by giving priority to appellees' claims.

■ We are of the opinion that the Uniform Commercial Code is totally inapplicable to non-possessory liens and that the question of their priority in relation to secured interests must be determined by existing statutes and pre-code case law. We note that this is the position taken by the majority of other jurisdictions faced with the question [2] and we consider it the correct interpretation of the Code.[3]

The feedman's lien statute set forth above is silent as to priorities and therefore we must depend entirely on case law.

■ The general rule, of course, is that a valid recorded chattel mortgage takes precedence over any later acquired feedman's lien. *Fletcher v. Bank of Meeker*, Okl., 376 P.2d 263 (1962). This "first in time, first in right" rule would appear to assure Kleen-Leen's priority in the proceeds, but appellees contend that the facts of this case place their liens within an exception to the rule. This exception is that the lien of a person who furnishes feed to the owner of animals with the knowledge and consent of the mortgagee is superior to the lien of the mortgage although the feed was furnished after the mortgage was filed. Appellees rely upon *National Bank of Commerce v. McDaniel, supra;* and *Cather v. Spencer,* 55 Okl. 511, 154 P. 1130 (1916), wherein we held the liens of feedmen were entitled to priority over chattel mortgages because the facts and circumstances showed that feed was furnished with the knowledge and consent of mortgagee.

■ We do not agree that the facts of this case place appellees within the exception of *McDaniel, supra,* and *Cather, supra.* In *McDaniel, supra,* one Hoff had been hired by McDaniel to care for his cattle, which McDaniel later mortgaged to Bank. After Bank repossessed the cattle, Hoff attempted to enforce liens on the cattle under both the feedman's lien statute at issue here, and the closely related "agister's" statute [4 O.S. § 191]. Hoff prevailed and the clear basis of the Court's decision granting Hoff's feedman's lien priority over the bank rested upon the actions of the bank which induced Hoff to spend his own money to buy feed for McDaniel's cattle.

The following statements from that opinion make the rationale of the decision clear:

"During the fall and winter grazing upon the ranch became short, and, Mr. McDaniel making no adequate provision for paying for or procuring feed for the herd elsewhere, Mr. Hoff performed these duties, and during this time, from about October or November, until January, when the cattle were taken by the bank, he had several conversations with the officials of the bank as to ways and means of protecting, caring for, and feeding the cattle. * * *

* * * The bank officials told Hoff to go ahead and buy fodder and take care of the cattle and the bank would see him through. This, too, with full knowledge on the part of the bank that Hoff was spending his own money for the purpose of keeping the herd in good condition. Of course, as it turned out, all of this redounded to the benefit of the mortgagee, who, it seems, was the only one who profited by Mr. Hoff's labor and effort to feed and care for the cattle under very trying circumstances; * * *."

Appellees also rely on *Cather v. Spencer, supra,* wherein we held that consent by the mortgagee for furnishing feed to mortgaged animals may be implied from the circumstances. We held there that the evidence at trial was sufficient to support such a finding but did not set forth the evidence.

Both *McDaniel, supra,* and *Cather, supra,* rely upon *First Nat'l. Bank of Mountain View v. Wilson,* 49 Okl. 370, 153 P. 172

---

**2.** See, e. g., *Board of Education v. Kolman,* 111 N.J.Super. 585, 270 A.2d 64 (1970); *Walton v. Piqua State Bank,* 203 Kan. 415, 464 P.2d 316 (1970); *Forrest Cate Ford, Inc. v. Fryar,* 62 Tenn.App. 572, 465 S.W.2d 883 (1971).

**3.** See, *Priorities between Article Nine Security Interests and Statutory Liens, in Iowa,* 23 Drake L.Rev. 169, 174 (1973).

(1915) as authority for the "knowledge and Consent" exception.

*First National Bank v. Wilson, supra,* makes the intent and scope of the exception clear. There, we upheld plaintiff's claim that her feedman's lien was entitled to priority over mortgagee Bank's interest although lien was subsequent in time to bank's chattel mortgage, because the bank had waived its priority by inducing plaintiff to borrow money from bank with which to purchase feed for mortgagor's animals. Bank's cashier had assured plaintiff that " . . . it would be all right, that she, as [mortgagor's] landlord would be perfectly safe in putting up the feed".

The Court stated:

"Under the facts in this case we think the bank ought not to be heard to say that plaintiff Wilson is not entitled to pay for such feed, which inured to the benefit of the bank in preserving the property upon which it had its mortgage. * * *

It is true that the mortgage was on file at that time, and the plaintiff knew of its execution, but the bank could waive its priority, and when by its action under the circumstances it induced her to purchase feed and loaned her the money with which to make such purchase, we think it has waived the right to assert the priority of its mortgage over her lien for the feed so furnished."

Neither Leger Mill nor Sheffield presented evidence which placed their respective situations within this exception.

Leger Mill asserts that because it was the local authorized Purina dealer, Kleen-Leen had knowledge that it was supplying feed and feed supplements to Scarbrough in that Kleen-Leen required Scarbrough to feed Purina to his animals. Leger maintains that Kleen-Leen consented to its furnishing feed to Scarbrough by sending "shipping notices" to Leger Mill before the swine were delivered to Scarbrough.

Kleen-Leen concedes that it had knowledge of the fact that Leger Mill was supplying feed for Scarbrough and that through its requirement of Purina feed, and then sending copies of shipping notices to Leger, it can be seen as having consented to the fact that Leger supplied the feed.

This is not, however, the nature of knowledge and consent necessary to come within the exception of *McDaniel, supra; Wilson, supra; Cather, supra.*

The mere knowledge of a mortgagee that feed is being supplied to mortgagor's animals by a certain seller is not, without more, sufficient. *Fletcher v. Bank of Meeker,* Okl., 376 P.2d 263 (1962). Nor is it sufficient, without more, that mortgagee consented to or approved of the source from which mortgagor obtained the feed.

The criteria of the exception are not met simply because mortgagee knows the mortgaged animals are eating. Everyone knows that animals eat and further, that food for them must be obtained from some source.

■ The knowledge and consent exception which will allow a subsequent lien holder to prevail over a previous recorded mortgage is dependent upon two essentials. First, upon mortgagee's knowledge that feed is being, or will be, supplied at the expense of the feeder, and second, upon mortgagee's promises or actions which induce feeder to supply feed to his detriment, based upon the belief that mortgagee has consented to the arrangement and will hold him harmless.

The requirement in the Kleen-Leen/Scarbrough contract that Purina feeds be given the swine was a requirement on Scarbrough, not Leger Mill. Leger Mill was not obligated to supply feed to Scarbrough, it did so voluntarily. The manager of Leger Mill testified that the financial arrangements between Leger and Scarbrough were made strictly between Scarbrough and himself. Kleen-Leen had no knowledge of the arrangement and was never advised of Scarbrough's indebtedness. Further, Kleen-Leen did not request Leger Mill to furnish Scarbrough with feed, made no promises to be responsible for Scarbrough's account and did nothing to induce Leger Mill to furnish feed.

■ Sheffield's only basis for its contention that it comes within the "knowledge and consent" exception is that a representative of Kleen-Leen once visited the Scarbrough operation and was told that grain was being purchased from Sheffield, and that the representative saw a grinder on the premises. From our preceding discussion regarding the intent and scope of the exception as set forth in *McDaniel, supra;* and *Cather, supra;* it is clear that these facts do not place this situation within the exception. Kleen-Leen had no knowledge that feed was being supplied to Scarbrough on credit, never requested that such be done or consented to such an arrangement.

■ Further, we are not persuaded by Leger's additional argument that it had a feedman's lien on the swine owned by Kleen-Leen (the original breeding herd plus the first farrowing) for feed furnished "to the owner" which is entitled to priority.

It is not necessary to reach questions of priority, for it is clear from the evidence that Leger waived any rights against Kleen-Leen as to the original herd that it may have otherwise had under the statute and may not now assert them. Testimony by Leger's manager showed that he attended at least one of the meetings set up to introduce potential producers to the "Kleen-Leen Program" and that he was always aware of the contractual obligations of the producers. One of these terms was that producers, such as Scarbrough, were to pay feed costs. As discussed above, all Leger's actions showed that Leger considered Scarbrough, not Kleen-Leen, responsible for paying for feed supplied the original breeding herd, as well as the progeny. Leger Mill never looked to Kleen-Leen for payment, never notified Kleen-Leen money was owing and never attempted to enforce its lien against those swine.

Leger Mill's arrangement with Scarbrough was totally inconsistent with the existence of the lien it now attempts to claim against Kleen-Leen. By such inconsistent conduct Leger Mill waived its lien on the animals. See, *Hall v. Black,* 93 Okl. 148, 220 P. 50 (1923).

We now consider Leger Mill's and Sheffield's claims of priority over Bank's security interest.

Both feedmen rely upon the fact that they began supplying feed to Scarbrough before the Bank perfected its security interest in September, 1970. Being first in time, they argue, they are entitled to priority.

■ Bank had no knowledge or notice of the claims of the feedmen when its security interest was perfected. Bank argues that these non-possessory liens are "secret" liens which are not favored by the law and that they cannot take priority over security interests, even where they are first in time, when the security interest was acquired by a third party who took without notice.

We agree. We have previously passed upon the priority of undisclosed non-possessory liens on animals asserted as prior to later recorded mortgage interests.

■ In *Exchange Natl. Bank of Tulsa v. Martin,* 172 Okl. 421, 45 P.2d 544 (1935) we held that the chattel mortgage of Bank, although later in time than the agister's lien claimed against the cattle, was entitled to priority. There the mortgagor had warranted to Bank that he was in possession and that there were no liens upon the cattle. In fact, the cattle were upon land of another who later brought action for agister's lien. We found that the mere fact that Bank had notice that cattle were on land of another did not make lien of that landowner prior. Bank was not compelled to believe that mortgagor warranted falsely but could conclude that the only existing relation was one of landlord-tenant from which no lien would arise.

We recognized there that while, as between one claiming an agister's lien and the owner of the animals or third parties with notice of the lien, possession was not necessary, a different rule applies to third parties without notice, and we quoted the following from *Hall v. Black,* 93 Okl. 148, 220 P. 50 (1923):

"An agister's lien is not, as between the parties or third persons having notice

thereof, lost by change of possession not inconsistent with it and not under circumstances indicating an intent to waive, relinquish, or abandon it. * * * Continuous possession of the property is essential only as between the lienor and third parties, as between the immediate parties the lien may continue after change of possession."

The second paragraph of the syllabus by the Court in *Exchange Natl. Bank of Tulsa v. Martin, supra,* states:

"The mere fact that an agister's lien had attached to animals prior to the date of a chattel mortgage upon such animal will not of itself make the agister's lien prior to the lien of the chattel mortgage."

In the instant case, Scarbrough warranted to Bank in the security agreement that there were no liens upon the swine other than those of Kleen-Leen. There were no circumstances which put Bank on notice of Scarbrough's indebtedness to Leger Mill and Sheffield. Possession was in, and remained with, Scarbrough and no notices of the debts were filed of record.

Bank was entitled to rely upon Scarbrough's representations that there were no other liens upon the swine. Without notice of the claims of the feedmen, Bank's interest is prior. While feedmen may have had liens, they are not entitled to priority over Bank's recorded security interest. *Exchange Natl. Bank of Tulsa v. Martin, supra. Martin, supra,* is consistent with our early decision of *McDaniel, supra.* In *McDaniel, supra,* Bank was at all times aware of Hoff's interest in the cattle. The Court there noted that at the time the mortgage was executed, the president of mortgagee bank inquired of mortgagor if the cattle were "in charge of a good man" and the owner advised that the "cattle were, and would remain, in charge of Mr. Hoff."

We further noted in *Martin* that a chattel mortgage filed of record cannot be "utterly disregarded" by one who claims to be an agister. At the time Bank's security interest was filed, Scarbrough's account with Leger Mill was in the approximate amount of $4,300.00, and his account with Sheffield was approximately $620.00. In the following months the feedmen voluntarily extended Scarbrough extensive credit so that his final indebtedness to them was many times greater than these amounts. Leger and Sheffield do not contend that Bank had knowledge of the credit arrangement and consented to it. The evidence would not support such a contention.

We hold that the interests of the secured creditors, Kleen-Leen and Bank, were prior to the liens asserted by Leger Mill and Sheffield. Because Leger Mill and Sheffield had no priority rights in the proceeds, the secured parties could not have converted the proceeds. Accordingly, judgment in favor of Leger Mill and Sheffield was erroneous and must be reversed. Further, judgment awarding Leger Mill and Sheffield attorney's fees must be reversed.

Reversed and remanded with instructions to vacate judgments in favor of Leger Mill and Sheffield and judgments awarding attorney's fees and enter judgments in favor of Kleen-Leen and Bank.

LAVENDER, V. C. J., and DAVISON, WILLIAMS, IRWIN and BERRY, JJ., concur.

HODGES, C. J., and BARNES and DOOLIN, JJ., concur in part, dissent in part.