**FIRST MARYLAND LEASECORP., a corporation, et al., Plaintiff-Cross-Claim Defendant/Counter-Claimant-Appellant,**

Jeffreys Steel Co., Inc., Intervenor-Plaintiffs and Cross-Claim Plaintiffs-Appellees,

v.

**The M/V GOLDEN EGRET, et al., Defendants-Appellees.**

No. 83–7674.

United States Court of Appeals, Eleventh Circuit.

July 1, 1985.

Alex F. Lankford, III, J. Hodge Alves, III, Neil C. Johnston, Mobile, Ala., for First Maryland Leasecorp.

Samuel M. McMillan, Mobile, Ala., for Bayou Lighting & Supply, intervenors.

Thomas E. Bryant, Charles N. McKnight, Mobile, Ala., for Standard Equipment Co., and Bell & Co., intervenors.

Lawrence Voit, Mobile, Ala., for Steel City Erection & Crane Rental Co., and Jeffreys Steel Co., Inc., intervenors.

Irvin Grodsky, Mobile, Ala., for Collier Shipbuilding, Inc. (as owner & claimant).

James D. Brooks, Ray Morgan Thompson, Mobile, Ala., for Inland Offshore Supply, Inc., intervenors.

Thomas E. Bryant, Jr., Charles N. McKnight, Mobile, Ala., for Johnson Machine Shop, Inc., intervenors.

Edgar P. Walsh, Mobile, Ala., for Bayou Cash & Carry, Inc., intervenors.

W. Borden Strickland, Mobile, Ala., for Industrial Welding Supplies, intervenors.

Before GODBOLD, Chief Judge, ANDERSON, and THORNBERRY [*], Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

First Maryland Leasecorp ("FML") appeals from a decision of the district court and challenges several of the district court's conclusions of law.

## I. FACTS

Collier Shipbuilding Co., Inc. ("Collier") originally agreed with Camcraft, Inc., a Louisiana corporation engaged in offshore petroleum exploration, to build and deliver six offshore petroleum exploration supply vessels known as Builder's Hull Nos. 24–

---

[*] Honorable Homer Thornberry, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

29. In the fall of 1981, Mr. D.E. Bowman ("Bowman"), a principal in Camcraft, Inc., came to FML seeking interim financing for construction of the six hulls.

After preliminary negotiations, FML agreed to finance construction of the hulls. FML and Bowman then entered into a security agreement which gave FML a security interest in all existing and after-acquired goods, parts, equipment, and inventory used or to be used in each of the six hulls, all contract rights, accounts, and general intangibles. Bowman also assigned all its rights in and to the vessel construction contract ("Construction Contract") to FML. Under the amended Construction Contract, Collier granted ownership of all inventory, hulls, and contract rights to Bowman individually and subordinated its rights in and to the Construction Contract to FML. Numerous provisions of these contracts are at issue in the present case.

The loan agreement between Bowman and FML also contemplated certain lending limitations such as (1) no more than $5,000,-000 was to be loaned and outstanding on the hulls at any given time, (2) no more than an aggregate of $10,000,000 could be loaned at any one time to Bowman to construct the hulls, and (3) FML would not lend on more than three hulls under construction at any given time. FML filed appropriate financing statements with the Alabama Secretary of State. Under the agreements, FML advanced funds to Bowman as construction on each of the six hulls progressed. Similarly, Collier was entitled to a draw at a previously-agreed stage of construction. After Bowman's marine surveyor verified the stage of completion, Bowman contacted FML, and funds were advanced to it and from Bowman on to Collier.

Hull 24 was completed by Collier and delivered to Bowman. After Bowman secured permanent financing for Hull 24, FML released its security interest with respect to that hull, and there is no dispute over the respective security interests concerning Hull 24.

As regards Hull 25 (also called the GOLDEN EGRET), the district court held that FML had a valid First Preferred Ship Mortgage which was superior to the claims of all other claimants asserting liens for services, supplies, and materials. That finding is not contested on appeal.

The present controversy stems from Bowman's inability to make the July, 1982, interest payments on Hulls 25, 26, and 27 to FML. Bowman defaulted on July 15, 1982, by failing to make the required interest payment. On July 30, 1982, Bowman and Collier entered into a "Mutual Release" in which Bowman assigned all of its interest in the hulls to Collier. FML disputes the validity of the release, arguing that its consent was necessary. Numerous intervenors ("the Intervenors") also assert claims against the hulls. In large part, the Intervenors supplied materials and services for construction of the hulls. FML disputes the existence and priority of various liens asserted by Intervenors in the unfinished hulls.

## II. WHETHER FML GAVE VALUE FOR ITS SECURITY INTEREST

The district court held that FML's security interest did not attach to Hulls 28 and 29 since FML gave no value for its security interest in those hulls. We disagree.

■ Three broad requirements must be met for a security interest to attach to any given collateral. First, the debtor must have signed a security agreement containing a description of the collateral. Second, the debtor must have rights in the collateral. Finally, the secured creditor must have given value. Ala.Code § 7–9–203 (1984).

It is clear that FML did not advance any funds against Hulls 28 and 29. The fact that FML never advanced any funds for these hulls is not, however, dispositive of the issue of whether FML gave value for its security interest in Hulls 28 and 29. Under the Code, value is defined as follows:

[A] person gives "value" for rights if he acquires them:

(a) In return for a binding commitment to extend credit or for the extension of immediately available credit *whether or not drawn upon* and whether or not a charge-back is provided for in the event of difficulties in collection; or

(b) As security for or in total or partial satisfaction of a preexisting claim; or

. . . .

(d) Generally, in return for any consideration sufficient to support a simple contract.

Ala.Code § 7–1–201(44) (1984) (emphasis added).

FML suggests several theories upon which the record reflects that "value" was given. We discuss two of those theories. First, FML clearly gave "value" for Hulls 24–27 since FML actually advanced funds for their construction. The parties disagree, however, as to whether the funds advanced for Hulls 24–27 constitute value for the security interest in Hulls 28 and 29 by virtue of the "cross-collateralization" clause in the security agreement. It provides:

The security interest of Creditor in each of the Vessels shall be separate, distinct and independent of each other and the security interest of Creditor in the contract as to each of the Vessels shall be separate, distinct and independent of each other. Provided however, it is the intent of the parties hereto that the Vessels financed by Creditor shall be security for each and every note payable to Creditor and in the event of foreclosure or realization against the Collateral on any one Vessel which may result in a deficiency therein, that Creditor shall have the right to proceed against the other Vessels to recover the amount owed.

FML's primary argument is that under this clause, all the hulls, including Hulls 28 and 29, were collateral for any and all indebtedness owed by Bowman to FML. Collier, however, focuses on the term "Vessels financed by Creditor" and notes that the term "Vessel" is defined in the loan agreement as one of the "six/173′ twin screw supply boats designated by builder's Hull No. 24, 25, 26, 27, 28 and 29." From this, Collier argues that Hulls 28 and 29 do not fit within the definition since neither of the partially completed hulls was capable of flotation and thus could not be deemed a "Vessel" within the meaning of the security agreement. We disagree.

Collier's argument, if accepted, forces one to assume that the parties intended for FML to have a security interest in the hulls only when the hulls reached the stage of construction in which they were capable of flotation. Collier, however, articulates no sound business reason for such an interpretation. Moreover, the express terms of the security agreement refute Collier's argument. The agreement describes the collateral as:

All of debtor's goods and/or inventory ... used and/or to be used in the construction of six (6) supply vessels bearing Hulls Nos. 24, 25, 26, 27, 28 and 29 (hereinafter said vessels collectively referred to as the "Vessels"), to be built for Collier Shipbuilding, Inc. .... It is the intent of this Security Agreement that all parts or portions of the vessels as identified in the contract for construction of the Vessels and/or included therein or thereon shall be covered by this Security Agreement.

Collier also argues that Hulls 28 and 29 were not "financed by Creditor," since FML advanced no monies on those hulls. From this, Collier reasons that the cross-collateralization clause did not extend to Hulls 28 and 29. Collier's interpretation of this provision is a strained one since it nullifies the express language of the cross-collateralization clause to the effect that "Creditor shall have the right to proceed against the other Vessels." When the security agreement was executed, FML was bound to finance all six hulls, within the limits described in the loan agreement. Thus, we believe that it is clear that the term "Vessels financed by Creditor" refers to all those vessels for which financing was contemplated at that time rather than only

those vessels as to which funds were, in fact, advanced by FML.

■ Thus, we agree with FML's first theory; the funds advanced by FML with respect to Hulls 24–27 constitute "value" for the security interest in Hulls 28 and 29, pursuant to the express terms of the "cross-collateralization" clause.

■ Second, FML argues that its commitment to extend credit constitutes "value" for its security interest in Hulls 28 and 29. The district court found that "FML had no binding commitment to extend credit on Hulls 28 and 29 because of the loan limits imposed on Bowman in the loan agreement." Similarly, the district court found that FML gave no consideration for its security interest in Hulls 28 and 29. We believe that the district court applied the wrong legal standard in reaching these conclusions. FML's undisputed obligation to extend credit subject to the limitations described in the loan agreement was certainly "consideration sufficient to support a simple contract." The fact that FML's obligation was subject to contractual limitations is not unusual and is of no consequence legally.

Thus, we conclude that FML did give "value" for its security interest in Hulls 28 and 29, and, accordingly, FML's security interest attached to those hulls.

### III. THE VALIDITY OF THE MUTUAL RELEASE

The district court also found that Collier was the owner of Hulls 28 and 29, subject to the watercraft liens asserted by Intervenors. The district court based its ruling on the "Mutual Release" executed by Bowman and Collier on July 30, 1982, in which Bowman purported to transfer his interest in the collateral to Collier.

■ We believe the district court could reach this conclusion only by holding that FML had no valid security interest in Hulls 28 and 29.[1] As noted above, however, FML

did have a valid security interest in Hulls 28 and 29. Thus, Bowman and Collier's attempt to divest FML of its security interest pursuant to the "Mutual Release" was ineffective. The Code provides:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Ala.Code § 7–9–306(2) (1984). Accordingly, we hold that FML's security interest in Hulls 28 and 29 was not affected by the "Mutual Release."

Thus, as between Collier, Bowman, and FML, FML's security interest clearly prevails over the interests asserted by Collier and Bowman.

### IV. PRIORITY OF THE WATERCRAFT LIENS ASSERTED BY INTERVENORS AS AGAINST THE PERFECTED SECURITY INTEREST

The Intervenors argue that their watercraft liens have priority over FML's perfected security interest. The Alabama watercraft lien statute states:

> A lien is hereby declared on any ship, steamboat or other watercraft, whether registered, enrolled or licensed or not, that may be built, repaired, fitted, furnished, supplied or victualed within this state, for work done, or material supplied by any person within this state, in or about the building, repairing, fitting, furnishing, supplying or victualing such ship, steamboat or other watercraft, and for the wages of the masters, laborers, stevedores and shipkeepers of such ship, steamboat or other watercraft, *in preference to other liens thereon for debts contracted by, or owing from, the owners thereof;* and for wharfage and dock-

---

1. The district court held that FML had a valid security interest in Hulls 26 and 27, subject to the Intervenors' watercraft liens. The district

court apparently recognized that the "Mutual Release" executed by Bowman and Collier could not affect FML's perfected security interest.

age; and such lien may be asserted in any court of competent jurisdiction.

Ala.Code § 35–11–60 (1975) (emphasis added). The district court held that the watercraft liens were superior to FML's security interest.

To support its argument for priority, FML notes that under Ala.Code § 7–9–301 (1984), a perfected security interest has priority over subsequent "lien creditors." "Lien creditor" is further defined as "a creditor who has acquired a lien on the property involved by attachment, levy, or the like...." Ala.Code § 7–9–301(3) (1984).

We believe, however, that § 7–9–301 refers primarily to judicial lien creditors; the drafters of the Code did not intend for § 7–9–301 to afford a perfected security interest priority over the numerous classes of statutory lien creditors. In our view, Article 9 is silent as to the priority the watercraft lien is to be afforded, leaving such priority to be determined by statutory lien provisions of the various states, in this case, Alabama.

Ala.Code § 7–9–102(2) states, in pertinent part, "[t]his article does not apply to statutory liens except as provided in § 7–9–310." Similarly, Ala.Code § 7–9–104 states that "[t]his article does not apply ... to a lien given by statute or other rule of law for services or material except as provided in § 7–9–310 on priority of such liens." The official comment to § 7–9–104 provides:

> In all jurisdictions, liens are given suppliers of many types of services and materials either by statute or by common law. *It was thought to be both inappropriate and unnecessary for this Article to attempt a general codification of that lien structure which is in considerable part determined by local conditions and which is far removed from ordinary commercial financing.* Moreover, federal law may displace state law in situations such as admiralty liens. Paragraph (c) therefore excludes statutory liens from the Article. Section 7–9–310 states a rule for determining priori-

ties between such liens and the consensual security interests covered by this Article.

Ala.Code § 7–9–104 comment 3 (1984) (emphasis added).

In turn, § 7–9–310(1) provides:

> When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

Ala.Code § 7–9–310(1) (1984). The purpose of the priority afforded by § 7–9–310 is to "provide that liens securing claims arising from work intended to enhance or preserve the value of collateral take priority over an earlier security interest even though perfected." Ala.Code § 7–9–310 comment 1 (1984). The section "makes the lien for services or materials prior in all cases where they are furnished in the ordinary course of the lienor's business and the goods involved are in the lienor's possession." Ala.Code § 7–9–310 comment 2 (1984).

It is clear, however, that the controversy in the instant case cannot be resolved under § 7–9–310 since none of the Intervenors' liens were possessory. Conflicting implications arise from the nonpossessory nature of the watercraft liens.

One could interpret the negative pregnant of § 7–9–310 as establishing a rule whereby all nonpossessory, statutory liens are subordinate to a perfected security interest. On the other hand, one could conclude that Article 9 simply does not attempt to establish a system of priorities for nonpossessory, statutory liens. We believe that the latter interpretation is the correct one.

In choosing between conflicting interpretations of § 7–9–310, we must be mindful of the fact that the Alabama legislature clearly intended to afford certain lien claim-

ants a priority under the watercraft lien statute. We are loathe to adopt an interpretation of § 7–9–310 that frustrates that intent. A straightforward reading of the watercraft lien statute indicates that, if § 7–9–310 were interpreted to require possession in order to confer priority, the priority afforded by the watercraft lien statute would, in large part, be frustrated.[2] It is clear that imposing a requirement of possession would be both commercially impracticable as well as physically impossible in many of the instances contemplated by the watercraft lien statute. For example, one who "victuals" a watercraft is normally incapable of taking possession of the vessel. Similarly, the only way the Intervenors in this case could take "possession" of the hulls would be to open their own shipyard. Thus, a requirement of possession would simply force suppliers to insist on a "cash on the barrel" arrangement.

In contrast to the numerous problems that result from an adoption of the negative implication contained in § 7–9–310, the conclusion that Article 9 does not apply to nonpossessory, statutory liens is supported by both sound reason and precedent from Alabama and other jurisdictions.

In *Leger Mill Co. v. Kleen-Leen, Inc.*, 563 P.2d 132 (Okla.1977), the Supreme Court of Oklahoma faced an analogous situation. There, certain feedmen attempted to enforce nonpossessory, statutory liens under an Oklahoma feedman's lien statute, and they argued that their feedmen's liens were superior to a prior perfected security interest in the subject swine, notwithstanding § 9–310 and the feedmen's lack of possession. In addressing the feedmen's claims, the Supreme Court of Oklahoma stated:

It is clear that the Uniform Commercial Code does not control the question of the priority between non-possessory liens and perfected security interests.

The secured parties, appellants here, contend that by the exclusion of non-possessory liens, the intent of the Code was to make them inferior in all instances to secured interests.

Appellees argue that even though non-possessory liens are not included in the Code's priority coverage, the stated purpose of § 9–310 to give priority to liens "... securing claims arising from work intended to enhance or preserve the value of the collateral" will be served by giving priority to appellees' claims.

We are of the opinion that the Uniform Commercial Code is totally inapplicable to non-possessory liens and that the question of their priority in relation to secured interests must be determined by existing statutes and pre-code case law. *Id.* at 135–36.[3]

The Alabama courts have also expressly stated that § 7–9–310 is inapplicable to nonpossessory liens. In *Peavy's Service Center, Inc. v. Associates Financial Services Co.*, 335 So.2d 169, 171 (Ala.App. 1976), the Alabama Court of Civil Appeals noted that Alabama has two mechanic's liens: one, a common law, possessory lien, and the other, a nonpossessory, statutory lien. Prior to the adoption of the UCC, Alabama courts had held that the nonpossessory, statutory mechanic's lien was subordinate to a conditional sales contract or chattel mortgage. *Id.* When it enacted the UCC, the Alabama legislature simultaneously amended its nonpossessory mechanic's lien statute to provide express language subordinating it to a prior perfected security interest. The *Peavy* court noted

---

**2.** We need not address the question of whether § 7–9–310 should be interpreted to afford priority to a perfected security interest as against a nonpossessory materialman's lien where the materialman has the option of perfecting his lien by maintaining possession. *See Forrest Cate Ford, Inc. v. Fryar*, 62 Tenn.App. 572, 465 S.W.2d 882 (1970).

**3.** The Oklahoma court went on to hold that the perfected security interests were superior to the feedmen's liens. However, that determination was based on an interpretation of Oklahoma common law and statutory lien provisions, and thus has no bearing on our resolution of the instant priority dispute which depends on a construction of the watercraft lien provisions under Alabama law.

that the "amendment was unnecessary" precisely because *"Section 9–310 applies only to possessory liens." Id.* (emphasis added). In other words, because Alabama law already provided that a nonpossessory, statutory mechanic's lien was subordinate, and because § 9–310 left such priorities in the status quo, it was unnecessary to amend the nonpossessory mechanic's lien statute to expressly restate the law.

*Smith v. Atlantic Boat Builder Co.,* 356 So.2d 359 (Fla.App.1978), is in accord. There, the Florida District Court of Appeals decided virtually the identical issue we face in the instant case under the Florida watercraft lien provision. In *Smith,* employees who performed labor on unfinished ship hulls argued that their nonpossessory, statutory liens were superior to a perfected security interest in the hulls. The *Smith* court noted the potential applicability of § 9–310 but concluded that it "has no applicability here because of the possession requirement set forth in that statute. The absence of possession in either party does not render the statute negatively applicable. It simply has no application at all." *Id.* at 365. In concluding that the laborers' watercraft liens were superior to a perfected security interest, the court noted:

> The bank, of necessity, had to know at the time that it acquired its liens that the boat builder had employees who were performing labor and incorporating materials into the boats. Such was an essential element of the manufacturing process. Without those labors the boat building company would not have been in business and there would have been no need for the bank loans. The hulls and boats in the possession of the boat builder were subject to the liens of its employees who performed labor incident to the construction. Its ownership was therefore subject to those liens. Its equity, then, was the hulls or boats or value thereof reduced by the laborers' liens.... [I]t is upon that equity, but only that equity, that the bank's lien on after-acquired property attached.
> 
> ....

... It would be an invidious preference to the creditor-bank, without so much as a showing that there is a compelling public interest or purpose served by such an arbitrary requirement should it be given an outright priority superior to the laborer's lien in the total after-acquired property and would be abhorrent to equity and justice and contrary to the equitable principles of the avoidance of unjust enrichment.

*Id.* at 366–67.

Although the Intervenors' watercraft liens are outside the terms of § 7–9–310, they are clearly within the policy expressed by that section since the materials and services provided by Intervenors enhanced the value of the collateral. Thus, we feel obliged to interpret § 7–9–310 in a manner that promotes the policies underlying the section.

The strongest argument in favor of a contrary interpretation focuses upon the important notice-giving function that possession provides. In our view, however, our holding does not undercut that function under the facts of the instant case since FML clearly had constructive notice of the fact that the materials and services used to construct the hulls might not be paid for.

In *Starek v. TKW, Inc.,* 410 So.2d 35 (Ala.1982), the Alabama Supreme Court held that a materialman's lien filed after the sale of a newly-constructed building was good as against a purchaser who lacked actual notice of the outstanding debt. The court distinguished the rule applicable to existing structures from that applicable to new buildings by reasoning that the "purchaser of a new building has constructive notice that material used to build a structure may not be paid for." *Id.* at 36. According to the court, "the fact that the work was in progress is notice to all who dealt with said property or contracted therefore with its owner that the right under the statute exists...." *Id.* at 37 (quoting Grimsley v. First Avenue Coal & Lumber Co., 217 Ala. 159, 115 So. 90 (1927)).

Finally, and significantly, the watercraft lien statute itself suggests that a properly perfected watercraft lien has priority over a perfected security interest. The statute provides that the lien created on the watercraft is "in preference to other liens thereon or debts contracted by, or owing from, the owners thereof...." Ala.Code § 35–11–60 (1975).

■ Thus, we hold that the Intervenors' watercraft liens, if properly perfected within the applicable statute of limitations, are superior to FML's prior perfected security interest.

## V. THE STATUTE OF LIMITATIONS UNDER THE WATERCRAFT LIEN ACT

The parties disagree as to the appropriate statute of limitations for asserting the watercraft lien. The district court held "that the applicable statute of limitations is six years pursuant to Ala.Code § 6–2–34(9) in view of the present version of Ala.Code § 35–11–60 which fails to include the six-month limitation which appeared in earlier forms of the statute." The six-year statute of limitations is the statute of limitations for all general contractual claims under Alabama law. We believe the district court erred in reaching this result.

■ FML argues that the district court ignored the plain terms of Ala.Code § 35–11–6 (1975). The section provides:

All cases arising under the provisions *of this chapter* where the process of attachment is authorized for the enforcement of any lien declared hereby, ... and, unless otherwise particularly provided for, must be commenced within six months after the demand becomes due; and unless commenced within that time, the lien is lost.

Ala.Code § 35–11–6 (1975) (emphasis added). Since § 35–11–60 (the Watercraft Lien Act) is clearly within Chapter 11, and § 35–11–1 authorizes attachment for enforcement of liens created under § 35–11–60, it seems clear that the applicable statute of limitations is six months.

Prior to the enactment of Alabama Code (1940), Title 33, § 6, the Alabama Code apparently contained separate statute of limitations provisions for each lien article. The predecessor article to § 35–11–60 contained the same requirement that suit to enforce the lien must be commenced within six months of the date demand was due. *See The Edna*, 185 F. 206 (S.D.Ala.1911). The fact that the present version of § 35–11–60 fails to specify a limitations period does not, however, mean that the general contractual statute of limitations period should be applied. Instead, the district court should have applied the six-month statute of limitations for liens created under Chapter 11.

Sound policy reasons support the relatively short statute of limitations of six months. We believe the provision is designed to allow an owner to resolve all lien claims on its property in a relatively short period of time. Otherwise, an owner would be "in limbo" for a period of six years, unable to positively ascertain whether it owned the vessel free and clear of all liens.

On remand, the district court should determine which of the various Intervenors' claims were properly perfected within the six-month limitation period.

## VI. THE APPROPRIATE BOND

The district court required FML to post a bond at double the amount of the hulls and materials or $3,602,000. The district court also ordered each appellee to post a $1,000 bond. The district court viewed FML's action as "most closely anologous to Alabama's statutory detinue procedure...." We believe the district court erred in reaching this result.

■ FML notes that the district court exercised admiralty jurisdiction over FML's claims against the GOLDEN EGRET and pendent admiralty jurisdiction over FML's claims against the remaining hulls and materials. Both the arrest and subsequent sale of all the property involved in the instant case were accomplished pursuant to the Admiralty Rules.

Given these facts, we believe the district court should also have looked to the Admiralty Rules in setting the amount of FML's bond. Supplemental Admiralty Rule E(1) provides that "[e]xcept as otherwise provided, this rule applies to actions in personam with process of maritime attachment...." Supplemental Admiralty Rule E(7) provides:

Whenever there is asserted a counterclaim arising out of the same transaction or occurrence with respect to which the action was originally filed, and the defendant or claimant in the original action has given security to respond in damages, any plaintiff for whose benefit such security has been given shall give security in the usual amount and form to respond in damages to the claims set forth in such counterclaim, unless the court, for cause shown, shall otherwise direct; and proceedings on the original claim shall be stayed until such security is given, unless the court otherwise directs. When the United States or a corporate instrumentality thereof as defendant is relieved by law of the requirement of giving security to respond in damages it shall nevertheless be treated for purposes of this subdivision E(7) as if it had given such security if a private person so situated would have been required to give it.

Thus, under Supplemental Rule E(7), the district court might require FML to "give security in the usual amount and form."[4]

## VII. THE PROPRIETY OF THE CIVIL CONTEMPT FINE

FML also argues that the district court erred in imposing a $20,000 fine that accrued to Collier's benefit for FML's failure to remove the unfinished hulls from Collier's shipyard. The district court initially charged Collier with the safekeeping of the property. On December 30, 1982, Collier demanded that the property be removed from its shipyard. A hearing was conducted on January 12, 1983, and on January 17, 1983, the district court ordered FML to remove the hulls prior to February 11, 1983. On February 9, 1983, FML moved for an extension of time until February 25, 1983, to remove the hulls. On February 11, 1983, the district court, without conducting a hearing, imposed a graduated fine for the benefit of Collier and denied FML's motion to extend the time for removal.

■ The parties agree that the imposition of the fine was accomplished pursuant to the district court's civil contempt power. FML argues, however, that it had a right to an impartial hearing concerning the imposition of the fine and notice of such hearing sufficient to give it time to prepare any defenses. It is undisputed that FML's motion for extension of removal time was unopposed and that no party moved that FML should be held in contempt. Similarly, no party submitted evidence of the damage or loss, if any, that would occur if the removal time were extended. Under these circumstances, we feel that the district court erred in imposing the fine.

"Since failure to obey a court judgment is an indirect contempt, notice by an order to show cause and a plenary hearing are appropriate." *Interdynamics, Inc. v. Firma Wolf*, 653 F.2d 93, 97 (3d Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). The Ninth Circuit has held that in a contempt proceeding, whether civil or criminal, the alleged contemnor is entitled to notice and a reasonable time to prepare his defense. *United States v. Hawkins*, 501 F.2d 1029, 1031 (9th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974); *see also In re Sadin*, 509 F.2d 1252 (2d Cir.1975).

---

4. We decline to determine the precise amount of an appropriate bond, that determination being within the discretion of the district court. *See Whitney-Fidalgo Seafoods v. Miss Tammy*, 542 F.Supp. 1302, 1305 (W.D.Wash.1982). We do note, however, that the $3,602,000 bond required of FML would have been excessive under Rule E(7). Since our decision on the merits results in FML realizing the benefit of all of the collateral except for the value of watercraft liens perfected within the six-month statute of limitations, the bond decision will be made in any event in a vastly different context.

In the instant case, FML was entitled to a hearing to present any defenses that it may have had to the alleged contumacious conduct. For example, Collier presented no evidence of the existence or extent of any losses it suffered, but the fine imposed accrued to its benefit. Although it was within the district court's power to compensate Collier for any losses caused by the alleged contumacious conduct, the fine so imposed must be based on evidence of the actual loss sustained by Collier. *See, e.g., United States v. United Mine Workers of America*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *McDonald's Corp. v. Victory Investments*, 727 F.2d 82 (3d Cir.1984). Accordingly, the district court's decision imposing a $20,000 fine in favor of Collier is vacated, and the matter is remanded for further consideration consistent with this opinion.[5]

The remaining arguments of appellant and Intervenors are without merit and warrant no discussion.

For the above-stated reasons, the decision of the district court is

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**5.** Intervenor Industrial Welding Supplies, Inc. ("Industrial") had obtained a judgment in state court against Collier for its claims at the time the instant case was filed. When the district court imposed the fine on FML for the benefit of Collier, Industrial garnished the funds that FML paid into the registry of the court. Industrial apparently asks this court to determine the relative rights, duties, and obligations of the respective parties. We decline to do this for several reasons. The district court has not ruled on the effect of the garnishment, and we would prefer for the district court to rule on this issue in the first instance. Moreover, the issue may well be rendered moot on remand if Collier is unable to prove damages resulting from FML's alleged contumacious conduct, or if after hearing the evidence the district court finds that FML was not guilty of contumacious conduct or the district court otherwise decides against imposing a fine under its contempt power. Finally, we note that none of the parties appears to have recognized that the potential availability of two funds from which Industrial might satisfy its claims (*i.e.,* the lien on the hulls and the garnished fine) may invoke the doctrine of marshaling. *Cf.* Ga.Code Ann. § 18–2–2 (1982) ("a creditor having a lien on two funds of the debtor, equally accessible to him, will be compelled to pursue the one on which other creditors have no lien"). *See generally* 53 Am. Jur.2d *Marshaling Assets* § 1 *et seq.* (1970).