The FIRST NATIONAL BANK AND TRUST COMPANY OF OKLAHOMA CITY, Plaintiff-Appellant,

v.

IOWA BEEF PROCESSORS, INC., Defendant-Appellee.

Nos. 78–1301, 78–1302.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 13, 1979.

Decided July 14, 1980.

George W. Dahnke of Hastie & Kirschner, Oklahoma City, Okl., for plaintiff-appellant.

James T. Malysiak of Freeman, Rothe, Freeman & Salzman, Chicago, Ill. (Edward W. Rothe of Freeman, Rothe, Freeman & Salzman, Chicago, Ill., and Harry H. Selph, II, of Baker, Baker, Wilson, Selph & Ford, Oklahoma City, Okl., with him on the brief), for defendant-appellee.

Before SETH, Chief Judge, LOGAN, Circuit Judge, and BOHANON, District Judge*.

LOGAN, Circuit Judge.

First National Bank & Trust Company of Oklahoma City (the bank) brought suit against Iowa Beef Processors, Inc. (IBP), asserting claims under the Oklahoma version of the Uniform Commercial Code. The claims arise from two sales of cattle.[1] The district court awarded summary judgment for IBP on the first sale claim, and awarded the bank summary judgment in the amount of $252,698 on the second sale claim. The court denied the bank's motion for prejudgment interest. Jurisdiction is based upon diversity of citizenship. Both parties appealed.

We must decide the following issues: (1) Whether the bank's security interest in the cattle sold in the first transaction continued after the sale to IBP; (2) whether IBP may offset $162,640 against the purchase price on the second transaction; and (3) whether prejudgment interest should have been awarded.

The facts are undisputed. Wheatheart, Inc. (Wheatheart) owned and operated

---

* Honorable Luther L. Bohanon of the United States District Court for the Eastern District of Oklahoma, sitting by designation.

1. Actually there were two groups of sales, ten in the first and three in the second. Because each group involves common legal issues, for convenience we will refer to each group as if it was a single transaction.

feedlots. Under its auspices investor limited partnerships were formed to acquire cattle to be fattened in the lots. Wheatheart Cattle Company (Cattle Company), a wholly owned subsidiary of Wheatheart, was a managing partner in these partnerships. Four of these partnerships—Wheatheart Cattle Feeding Funds 4, 11, 12 and 13 (Funds)—borrowed money from the bank to purchase cattle. The bank took a perfected security interest in the cattle. These cattle were fed out in the Wheatheart lots until they reached the desired weights and were sold by Wheatheart.

Under the financing arrangement with the bank, Wheatheart would receive payment for the cattle in its own name directly from the purchaser. Wheatheart would then deposit this check or draft in its account and write its own check for that amount, payable jointly to the Funds and the bank. A bonded warehouseman, Lawrence Systems, Inc., was used to control the delivery of the cattle to the purchasers and to monitor the transfer of the payment check to the bank.

In 1974 Wheatheart began experiencing severe financial trouble. During December 1974 and January 1975, Wheatheart sold almost all the cattle in its feedlots without notifying the bank of the sales or remitting any of the proceeds to the bank or the Funds. On January 22 Wheatheart filed for bankruptcy, leaving the bank with a large outstanding loan balance and no collateral in the hands of the debtor or its agents. Consequently, the bank sought to recover some of its loss from IBP which had bought Wheatheart cattle in two transactions during this period. There is no contention that IBP was not a good faith purchaser.

The circumstances surrounding the sales are these: IBP had made the first purchase in December. On January 9, Wheatheart mailed sight drafts of $162,640 to IBP's bank to obtain advances on the final purchase price for the last carloads. The next day the cattle were slaughtered and a final price of $183,676 was set.[2] IBP paid this amount by check on January 13. Wheatheart deposited this check. It nevertheless asked IBP to honor the drafts, which Wheatheart asserted it had already sent through for collection; Wheartheart promised to send a check immediately to cover that amount. IBP agreed to this arrangement and, after receiving Wheatheart's check, instructed its bank to honor the drafts. The drafts were honored on January 16; Wheatheart's check, however, was dishonored by its bank on January 20. Meanwhile, IBP made a second purchase of cattle on January 15, and the price was determined on January 20 and 21 to be $252,698. On January 22 IBP was notified the Wheatheart check had been dishonored and Wheatheart had filed for bankruptcy. IBP never sent payment for the second purchase of cattle.

## I

The district court granted summary judgment on the first sale in favor of IBP. It ruled the bank had given express consent to the sale, which cut off any continuing security interest in the collateral pursuant to Okla.Stat.Ann. tit. 12A, § 9–306(2) (West 1963).[3] The bank attacks this decision, arguing that whether consent was given is in issue and therefore not properly a matter for summary judgment.

■ Section 9–306(2) authorization can be given "in the security agreement or otherwise." The security agreement here contained no reference to sales and therefore, of course, gave no authorization for sales. Thus, we must look elsewhere for authorization. Under Oklahoma law, authorization to sell collateral can be both express and implied. *See Poteau State Bank v. Denwalt*, 597 P.2d 756, 760 (Okl.1979). Here the revolving credit agreement be-

---

**2.** The cattle were sold on a grade and yield basis; thus, the exact price could not be determined until the packer had slaughtered the cattle. Because of the time lag, the purchaser would often advance a part of the purchase price to the feedlot.

**3.** The security agreement provides that Oklahoma law controls.

tween the Funds and the bank provides only that "all proceeds of the sale of cattle" are to be applied to reduce the loan balances, and that the Funds "will not dispose of any of its assets except for full, fair and reasonable compensation." Also, the bank made the following statement in response to an interrogatory: "[T]he borrowers had standing consent to sell cattle. However, such consent was conditioned upon prompt remission of the proceeds of such sale to plaintiff." Further, depositions in the record contain the following responses by bank officers to questions concerning the authority to sell: ·

A. [Bank Vice President for agricultural loans Samuel Gilmore] I guess he has, I guess Lawrence has the implied consent from the bank to release those cattle, so long as they get me the money for the cattle.

Q. Where is that implied consent?

A. In the delivery instructions.

Q. Did the Lawrence people have the authority from the bank to open the gate and let the cattle out into the chute to be loaded onto the truck without checking with the bank?

A. So long as they got me the check for the proceeds within seven days.

and

Q. Now, that security agreement, and I'm talking about the standard printed agreement,[4] did provide that the collateral could not be sold without the consent of the bank, did it not?

A. [Bank Senior Vice President Ronald Bradshaw] I believe that's right.

Q. But in fact that was not required of your borrowers?

A. In the trade itself, I've never seen—I haven't seen it done that way. I mean in the trade, I don't—I haven't seen it a requirement that the bank give permission that the cattle be sold.

Q. Prior to the time of sale you mean?

A. Right.

Q. That is not customary in the cattle business, is it?

A. Not to my knowledge, no.

Q. And you, in making your cattle loans, did not require that, did you?

A. We didn't, no.

Plaintiffs point to no contrary evidence in the record. Based on the documents and admissions by the bank officers that consent to sell was given, we conclude there is no disputed issue of fact.

The bank contends, however, that even if consent was given, it was conditioned on the bank receiving the proceeds from the sale—a condition not performed here. Assuming the authorization was so qualified, we must decide whether the bank could condition its consent in this way.

The normal rule is that a buyer in ordinary course of business cuts off the security interest in collateral sold. Okla. Stat.Ann. tit. 12A, § 9–307 (West 1963). Cattle feeding arrangements are unusual in at least two respects, however. First, they may be sales of "farm products from a person engaged in farming operations," which are excepted from the usual rule of section 9–307. This exception permits the secured party to reach the collateral in the hands of a good faith purchaser unless consent to the sale has been given pursuant to section 9–306(2). Second, because a feeding operation entails the continuing process of · acquisition and, after only a short feeding period, sale, the cattle are more like inventory than farm crops, which might be harvested only once each year. The reality of cattle financing arrangements is that the secured party expects and wants the collateral to be sold continually in order for it to receive payment on the line of credit it has extended. At the same time, however, the secured party is reluctant to give blanket consent to the sales because it would lose its right to go against the purchaser should the debtor default. Consequently, secured par-

---

4. Apparently the reference here is to a standard security contract used by the bank in other circumstances; no printed agreement was utilized in the transactions at issue in this case, nor was there any reference in the forms used here to the effect collateral could not be sold without consent of the bank.

ties in this area have tried to protect themselves by placing conditions on sales authorizations.

Courts have recognized the validity of certain of these conditions. *See, e. g., North Central Kan. Prod. Credit Ass'n v. Washington Sales Co.,* 223 Kan. 689, 577 P.2d 35, 38 (1978) (authorization to sell if payment made jointly to seller and bank); *Baker Prod. Credit Ass'n v. Long Creek Meat Co.,* 266 Or. 643, 513 P.2d 1129, 1134 (1973) (authorization to sell on condition buyer's drafts drawn on defendant bank were honored and paid); *Farmers State Bank v. Edison Non-Stock Coop. Ass'n,* 190 Neb. 789, 212 N.W.2d 625, 628 (1973) (consent to sell so long as no prior default has occurred). In all these cases the condition was either a condition precedent ascertainable by the purchaser prior to the sale or a matter within the control of the buyer.

There are a few cases involving conditions like the one imposed here. In *Southwest Washington Prod. Credit Ass'n,* 92 Wash.2d 30, 593 P.2d 167, 169 (1979), the court, after concluding consent was conditioned on the secured party receiving the proceeds, found that violation of the condition left the secured party with a right to reach the collateral that was sold. Unlike the instant case, however, the security agreement expressly prohibited sale of the collateral without the written consent of the lender.[5] Also, the buyer had failed to pay the debtor for the encumbered goods and consequently the seller was unable to pay the secured party.

Other courts have held that when consent is conditioned on the debtor's agreement to remit the proceeds, the consent is effective to release the lien on the collateral sold even though the secured party never received the proceeds. In these cases the buyer had paid the debtor, yet the debtor failed to remit the proceeds to the secured party.

In the present case there is substantial evidence from which the trier of fact could find the bank gave general authority to Glenn Meier [the debtor] to sell collateral subject to his duty to account for the proceeds. The bank acknowledges no complaint would have been made here had the proceeds been applied against the note. The bank lost because it trusted Glenn Meier to do what he had done before when he sold collateral. Murray [the buyer] trusted his assurance the sale was free of lien. As between the bank and Murray, the law imposes the risk of loss in these circumstances on the bank.

*Lisbon Bank & Trust Co. v. Murray,* 206 N.W.2d 96, 99 (Iowa 1973). *See also United States v. Hansen,* 311 F.2d 477, 480 (8th Cir. 1963) (applying Iowa law); *North Central Kan. Prod. Credit Ass'n v. Washington Sales Co.,* 223 Kan. 689, 577 P.2d 35, 41 (1978).

■ The Code puts a greater burden on the buyer of farm products to check for liens on the collateral because a good faith purchase of those products does not automatically cut off the security interest. Okla.Stat.Ann. tit. 12A, § 9–307 (West 1963). IBP did not check to determine whether a security interest was involved and, if so, what the terms of the agreement were. We hold this failure is irrelevant here because the bank gave the debtors actual authority to sell; it was not necessary that this authority be communicated to the purchaser. *See Lisbon Bank & Trust Co. v. Murray,* 206 N.W.2d at 99. *See also First Nat'l Bank & Trust Co. v. Stock Yards Loan Co.,* 65 F.2d 226, 229–30 (8th Cir. 1933) (pre-UCC chattel mortgage case). Even if IBP had checked, the bank presumably would have informed IBP that it had agreed to allow buyers to pay Wheatheart directly. Moreover, IBP could not have

---

5. The buyer had argued that the bank, by its action of permitting sales by the debtor, had waived its right to insist upon written consent. Cases involving a course of dealing as a waiver of a requirement in a written contract involve the policy of U.C.C. § 1–205(4) that express

terms control over course of dealing and trade usage. *Compare Clovis Nat'l Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967) *with Garden City Prod. Credit Ass'n v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971).

known at the time of the sale that Wheatheart would not remit the proceeds to the bank.

 Consent to sell in the debtor's own name "provided" the seller remits by its own check to the bank is not a true conditional sales authorization. In essence, such a condition makes the buyer an insurer of acts beyond its control. The bank has made performance of the debtor's duty to remit proceeds to the bank a condition of releasing from liability a third party acting in good faith. IBP could not ascertain in advance whether this condition would be met, as it could if a condition precedent was involved; nor did IBP have any control over the performance of the condition, as, long as it paid Wheatheart. A secured party has an interest in protecting its security by conditioning its consent, but it can place conditions that would afford it protection without great unfairness to the good faith purchaser.

We conclude that the policy of the Uniform Commercial Code to promote ready exchange in the marketplace, see *Riverside Nat'l Bank v. Law*, 564 P.2d 240, 243 (Okl. 1977), outweighs the secured party's interest in the collateral under these circumstances. Therefore, we hold that even though the secured party conditions consent on receipt of the proceeds, failure of this condition will not prevent that consent from cutting off the security interest under section 9–306(2).

## II

 The claim arising from the second sale presents different questions. Wheatheart took bankruptcy before IBP could pay for these purchases, and IBP has never paid anyone for the cattle. The question before us is whether IBP can offset the $162,640 Wheatheart owed it on the dishonored check against the $252,698 IBP owed on the cattle. IBP argues it owes only $90,058.[6]

The bank has a security interest in the proceeds of the sale by virtue of Okla.Stat. Ann. tit. 12A, § 9–306(2) (West 1963) and its security agreement.[7] IBP's claim of set-off is in direct conflict with the bank's interest. To resolve the conflict, we must first consider what law governs the priorities between these two interests.

Okla.Stat.Ann. tit. 12A, § 9–104(i) (West 1963) specifically excludes any right of set-off from the scope of Article 9. IBP argues this section prevents application here of the rules of Article 9 that give perfected security interests priority over other interests. The closest Oklahoma case is *Leger Mill Co. v. Kleen-Leen, Inc.*, 563 P.2d 132 (Okl.1977). This case involved the interpretation of an analogous provision, Okla.Stat.Ann. tit. 12A, § 9–104(c) (West 1963), which excludes statutory liens from the operation of Article 9. The Oklahoma Supreme Court held that the Uniform Commercial Code was inapplicable to the question of the priority between nonpossessory liens and secured interests. It then applied the common law rule that "a valid recorded chattel mortgage takes precedence over any later acquired feedman's lien . . . [except] that the lien of a person who furnishes feed to the owner of animals with the knowledge and consent of the mortgagee is superior to the lien of the mortgage although the feed was furnished after the mortgage was filed." 563 P.2d at 136.

Applying this rule to the present case would give the bank's security interest priority. There is, of course, no claim the bank knew of or consented to IBP's extension of credit. The bank's perfected security interest was prior in time to any claim IBP has against Wheatheart.

Courts in other states specifically considering the implications of the set-off provision have concluded that it merely removes the right of set-off from the filing and perfection requirements of Article 9,

---

**6.** IBP tendered this amount to Wheatheart's trustee in bankruptcy, who refused to accept it.

**7.** The bank's claim for the price of the cattle is also based on its security interest in the collat-

eral. We need not deal with this aspect, however, because of our disposition of IBP's set-off argument.

and does not affect the applicability of the Article's priority rules when a security interest is involved. *See, e. g., Citizens Nat'l Bank v. Mid-States Dev. Co.*, 380 N.E.2d 1243 (Ind.App.1978); *Associates Discount Corp. v. Fidelity Union Trust Co.*, 111 N.J. Super. 353, 268 A.2d 330 (Law Div.1970). These courts held that under the Code the security interest had priority over a set-off. Therefore, the result here is the same whichever law is applied.

IBP argues it is unfair to characterize the situation as a secured creditor versus an unsecured creditor, since its overpayment to Wheatheart was not meant to be an extension of credit and was no different in effect than if it had paid part of the purchase price on the second sale by an advance.[8] We disagree. IBP allowed Wheatheart to cash the draft only in return for Wheatheart's check; this was not considered by the parties as an advance. We do not think it is unfair, therefore, for the risk of the check being dishonored to fall on IBP. Furthermore, although IBP gave value to Wheatheart very close to the time of the sale, this value was not "proceeds" to which the bank's security interest could attach. To allow a buyer to designate prior value given to the debtor as proceeds of a subsequent sale would seriously undermine a secured party's interest.

■ IBP raises equitable estoppel as a final defense here, arguing the bank is estopped from claiming the proceeds because it knew or should have known of Wheatheart's violation of the security agreement and its financial difficulties. The district court found the doctrine inapplicable because IBP's overpayment was primarily responsible for the problem. We agree.

### III

■ The district court denied the bank's application for prejudgment interest, concluding that Okla.Stat.Ann. tit. 23, § 64 (West 1955) was inapplicable to a judgment based on a perfected security interest and that Okla.Stat.Ann. tit. 23, §§ 6 and 22 (West 1955) did not allow recovery when, as here, judgment was necessary before the amount of the claim could be ascertained.

Section 6 provides as follows:

Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

The sum owed by IBP on the second sale was certain—$252,698. That the parties disputed whether IBP could offset the $162,640 debt due from Wheatheart does not remove the case from section 6. Almost any lawsuit involves some dispute over defendant's liability. As to the sum certain aspect, the correct inquiry is whether "the amount sued for" can be ascertained prior to judgment. *See Frankfurt v. Bunn*, 408 P.2d 785, 789 (Okl. 1965). *See also* 5 Corbin on Contracts § 1046 (1964). *Cf. Metropolitan Elec. Co. v. Mel-Jac Const. Co.*, 576 P.2d 323 (Okl.App. 1978) (section 6 not applicable because amount due under a cost-plus contract is disputed).

Section 6 also provides that the right to recovery must vest on a certain day and states this is the day interest begins. IBP argues the bank's right as a secured creditor to the proceeds in IBP's hands did not vest until it foreclosed its security interest by judgment. We disagree. By virtue of its security interest in proceeds, the bank had an interest in the amount due under the sales contract. Once the sales price became overdue, the bank had a right to proceed against IBP to collect this amount and its right vested at that moment. That the bank had to file a lawsuit to enforce this right makes no difference; it is not unlike any contract or insurance policy dis-

8. We need not decide here whether an advance on the purchase price could be offset against the total amount due. One court, however, has given the secured party priority even in this situation. *See Imperial NH3, Division of Western Farm Serv., Inc. v. Central Valley Feed Yards, Inc.*, 70 Cal.App.3d 513, 139 Cal.Rptr. 8 (1977).

pute in which one party refuses to pay the other.

This result is not unfair to IBP; it had the use of the money during all of this time. If IBP could proceed against Wheatheart to collect the amount of the dishonored check, doubtless it would be entitled to interest from the day of dishonor. But IBP's inability to collect either the amount due it or prejudgment interest because of Wheatheart's bankruptcy should not affect the result here.

The judgment is affirmed except on the issue of prejudgment interest; as to that aspect it is remanded for further proceedings consistent herewith.