STERLING NATIONAL BANK & TRUST COMPANY OF NEW YORK, Plaintiff-Appellee,

v.

SOUTHWIRE COMPANY, Defendant-Appellant.

No. 82–8246.

United States Court of Appeals, Eleventh Circuit.

Aug. 29, 1983.

Rehearing and Rehearing En Banc Denied Oct. 3, 1983.

Gambrell & Russell, Atlanta, Ga., James H. Bratton, Jr., John G. Despriet, Jane Childs Carr, for defendant-appellant.

Jones, Bird & Howell, Robert H. Walling, Atlanta, Ga., for plaintiff-appellee.

Before HATCHETT and CLARK, Circuit Judges, and SCOTT *, District Judge.

PER CURIAM:

On September 8, 1977, Sterling National Bank advanced $3,989,696.66 to Metric International, Inc., a dealer in copper and other metals; later, Sterling periodically advanced Metric other funds. In return, Metric granted Sterling a broad security interest in the metals it dealt. The coverage of this perfected interest ranged from raw materials to goods in process, to finished goods and proceeds. In a supplement to the financing agreement, Metric promised Sterling, "[E]xcept for sales in the regular course of business, we shall not sell ... any Collateral without your prior written consent."

This case presents the issue of whether Metric's financing agreement authorized Metric's transfer of copper to appellant Southwire in satisfaction of a preexisting debt. The primary element of this issue is whether the transfer was a "sale in the regular course of business." The district court held that it was not such a sale. Further, the case presents the issue of whether Southwire possessed some right of setoff superior to Sterling's security interest. The district court concluded that it did not. We affirm the decision of the district court.

During 1977 and 1978, Metric had a "tolling" or "conversion" contract with Southwire Company, which not only purchases and sells both copper scrap and its converted form, copper cathode, but also converts the scrap to cathode. The tolling agreement provided that Metric deliver 200,000 pounds of scrap each month and pay 10.5 cents per pound for conversion of the scrap to cathode. In exchange, Metric could draw a proportionate amount of cathode.

At the end of May 1978, Metric had at Southwire a surplus of 476,000 pounds of cathode. But, at the same time, Metric owed Southwire about $175,430 in tolling charges. When Metric asked that Southwire release cathode to Metric's customer Westinghouse Electric, Southwire refused because Metric had not paid the tolling charges, a preexisting debt. To obtain release of cathode to Westinghouse, Metric transferred to Southwire 265,000 pounds of cathode at 66.2 cents per pound. This transfer was in payment of the tolling charges. In turn, Southwire released 200,000 pounds of cathode to Westinghouse.

Subsequent to Metric's transfer of cathode to Southwire, Metric filed for bankruptcy around June 5, 1978. Sterling then wrote Southwire asking that it confirm that it held 2,777,842 pounds of cathode belonging to Metric. However, Sterling was to learn, Southwire in fact now held only 11,831 pounds for Metric.

---

* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, was a member of the panel that heard oral arguments but due to his death on May 12, 1983 did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

Sterling sued Southwire for converting the 265,000 pounds of cathode that Metric had transferred to it in payment of the tolling charges. The district court granted summary judgment favoring Sterling.

Under Georgia law, a security interest continues in collateral notwithstanding sale, exchange or other disposition, unless such transaction "was authorized by the security agreement or otherwise." Off. Code Ga. Ann. sec. 11–9–306(2) (1982). In the present case, the security agreement expressly excepted from coverage "sales made in the regular course of [Metric's] business."

The Georgia Code provides that a "buyer in the ordinary course of business" takes inventory free of any security interest. Off. Code Ga.Ann. sec. 11–9–307 (1982). Under the definition of "buyer in the ordinary course of business," " 'buying' . . . does not include a transfer in bulk or as a security for or in total or partial satisfaction of a debt." Off.Code Ga.Ann. sec. 11–1–201(9) (1982). Under this definition, appellant Southwire is not a "buyer in the ordinary course of business," because the transfer was in satisfaction of a debt.

However, as Southwire states in its brief, and as the district court properly noted, a "sale in the regular course of business," as the term is used in the instant case's financing agreement, does not require a "buyer in the ordinary course of business." *Bitzer-Croft Motors, Inc. v. Pioneer Bank & Trust Co.,* 82 Ill.App.3d 1, 37 Ill.Dec. 247, 401 N.E.2d 1340 (Ill.App.1980). The district court was true to this distinction, although the court nonetheless found that the transfer in question was not a "sale in the regular course of business." In reaching this finding, the district court did not apply "buyer in the ordinary course" standards; rather, the court examined the transfer and plainly found that it was not a sale in the regular course of business.

As the district court noted, Southwire argues that the transfer of cathode from the Metric account to the Southwire account to cover the accumulated tolling charges was no different from Metric's sales in the regular course of its business as a dealer in copper scrap and copper cathode. Therefore, Southwire contends, the transaction was not covered by the security agreement. "However," as the district court wrote, "the specific type of transaction here consisted of an offset transaction whereby a refiner's accumulated tolling charges were cancelled out by a transfer of refined copper from Metric to the refiner." Order, p. 1. Southwire required this "offset transaction" or "setoff" before it would perform its role in the transfer Metric had arranged with Westinghouse Electric.

■ The district court properly found that this setoff was not a sale in Metric's regular course of business. The district court correctly determined that the record is devoid of evidence that "Metric had ever previously entered into this type of transaction with the defendant or with any other refiner." Sterling presented an affidavit from Metric's former president stating that all its sales of collateral to Southwire or to any other party, apart from the "sale" at issue now, had always generated proceeds or accounts receivable. The court did note Southwire's evidence that it had set off tolling charges against the accounts of other metals dealers and that other refiners had done so also. However, Metric had never been subject to a setoff; therefore, the setoff cannot be viewed as an occurrence in the regular course of Metric's business. The district court appropriately noted *Crystal State Bank v. Columbia Heights State Bank,* 295 Minn. 181, 203 N.W.2d 389 (1973). In that case, the Minnesota State Supreme Court decided the issue of whether the sale of a car to the controlling shareholder of a car dealership was a sale " 'in the ordinary course of business' " within the meaning of a security agreement creating a security interest in the dealership's inventory. 203 N.W.2d at 390. Although the Minnesota court decided that the sale at issue in the case was such a sale, the court stated in reaching this decision:

Examples of types of transactions which were prohibited by the requirement that sales be "in the ordinary course" include

bulk sales, *transfers in satisfaction of a preexisting debt,* gifts, and the like. 203 N.W.2d at 392 (emphasis added). The transaction in the present case, a transfer of copper cathode in satisfaction of the preexisting tolling charges, was not a sale in the regular course of business.

Moreover, Sterling's perfected security interest has priority over any right of setoff that Southwire may claim against Metric. The district court did not fail to recognize any such right, as Southwire asserts; rather, the court simply concluded that the right of the secured party had priority. This point is made well in *First National Bank, etc. v. Iowa Beef Processors,* 626 F.2d 764 (10th Cir.1980), the circumstances of which are as follows. In December 1974, Wheatheart, Inc., sold cattle to Iowa Beef Processors ("IBP") for the first time. On January 9, 1975, Wheatheart mailed sight drafts for $162,640 to IBP's bank. A final price could be set precisely only after the cattle were slaughtered. On January 10, they were, and their final precise price was $183,676. IBP paid this amount by check on January 13. Wheatheart deposited this check, but nevertheless, asked IBP to honor the sight drafts, because, Wheatheart asserted, it had already sent them through for collection; Wheatheart promised to send IBP a check immediately to cover the $162,640. IBP agreed to this arrangement and, after receiving Wheatheart's check, instructed the bank to honor the sight drafts, which the bank did on January 16. However, on January 20, Wheatheart's bank refused to honor Wheatheart's check to IBP for $162,640. Meanwhile, on January 15, Wheatheart sold IBP cattle a second time for $252,698, a price set on January 20 and 21. On January 22, IBP received notification that Wheatheart's bank had refused to honor the check for $162,640 and that Wheatheart had filed for bankruptcy. IBP never sent payment for its second purchase of cattle from Wheatheart.

The question before the Tenth Circuit panel was whether IBP could offset the $162,640 Wheatheart owed on the dishonored check against the $252,698 IBP owed on the cattle. IBP argued that it could and, thus, owed Wheatheart only $90,058. The First National Bank had a security interest in the proceeds of Wheatheart's sale. IBP's claim of setoff was in direct conflict with this interest.

The panel stated that under the Code the security interest had priority over the setoff, citing *Citizens Nat'l Bank v. Mid-States Dev. Co.,* 177 Ind.App. 548, 380 N.E.2d 1243 (1978), and *Associates Discount Corp. v. Fidelity Union Trust Co.,* 111 N.J.Super. 353, 268 A.2d 330 (Law Div.1970). IBP argued that the enforcement of the priority was unfair, since its overpayment to Wheatheart was not meant as an extension of credit and was in effect no different from an advance on the second purchase. The panel disagreed, saying that no advance was intended; that IBP allowed Wheatheart to cash the sight drafts only in exchange for Wheatheart's check. The court wrote, "We do not think it is unfair, therefore, for the risk of the check being dishonored to fall on IBP." 626 F.2d at 770.

In the present case, Southwire, unlike IBP, has not raised even a doubt that it had extended credit to Metric insofar as the tolling charges were still owing. Furthermore, in reasoning appropriate to the present case, the Tenth Circuit panel wrote that although IBP, by paying the sight drafts, gave value at a time very close to the time of the second cattle sale, "this value was not 'proceeds' to which the bank's security interest could attach." 626 F.2d at 770. The court stated, "To allow a buyer to designate prior value given to the debtor as proceeds of a subsequent sale would seriously undermine a secured party's interest." 626 F.2d at 770. In the present case, to allow Southwire to designate the tolling charges that Metric owed—that were "prior value given" to the debtor Metric—as proceeds of a sale of copper cathode would undermine Sterling's security interest. IBP's attempted setoff of the dishonored check against the second sale is fundamentally indistinguishable from Southwire's required setoff of tolling charges against Metric's cathode account. Southwire had

blocked Metric's transaction with Westinghouse Electric until Southwire could set off the tolling charges.

Appellant asserts assiduously that the district court "erroneously relied on one factor instead of considering the May 30 transaction as a whole." Brief at 24. On the contrary, the district court quite scrupulously took in the whole transaction and then described it as a setoff; it is the appellant who is relying on a shallow basis to describe the transaction as a sale in the regular course of business. Although Metric may have in the past transferred cathode to Southwire, it had never done so in satisfaction of a previous debt—satisfaction that was necessary to make possible the subsequent transaction with Westinghouse.

Southwire argues, "Metric did not have vested ownership rights in the collateral because it had failed to pay the tolling charges . . . so Sterling's security interest did not attach because a security interest attaches only to the extent of the debtor's interest." Brief at 41. Southwire cites a case in which a debtor indeed had not gained "rights in the collateral," as U.C.C. section 9–204 requires for attachment. *Himes v. Cameron County Construction Corp.,* 289 Pa.Super. 143, 432 A.2d 1092 (1981). *Himes* lacks authority in the present case since Sterling's security interest had attached. Southwire has ignored its own contract with Metric. Paragraph 21 of that contract states in part, "Ownership—The parties hereto recognize that ownership in the material shipped to Southwire by Customer for conversion under the terms of this contract shall be in Customer." Thus, Metric had rights in the copper cathode sufficient for Sterling's security interest to attach. The Georgia Code states that, if a security interest in goods was perfected and if the financing statement covered the product into which the goods were processed, the security interest covers that product as well as the initial goods. Off. Code Ga.Ann. sec. 11–9–315 (1982). In the present case, the financing statement did so cover the goods in process and the finished product, the copper cathode. Sterling's security interest covers the cathode.

Appellant notes the following sentence from the contract between Southwire and Metric:

> This contract shall not be construed as either a negotiable document of title or a waiver of any rights which Southwire may possess, under any applicable set of laws, to set off or pursue any valid liens or claims against the customer's materials.

Under any applicable set of laws, Southwire has no contractual or statutory right of setoff superior to Sterling's security interest. Southwire refers to a "statutory right of set-off" in Ga.Code Ann. sec. 20–1302, now Off. Code Ga.Ann. sec. 13–7–5 (1982). However, that section of the Code's title on contracts says simply, and in its entirety, "Between parties themselves, any mutual demands existing at the time of commencement of the suit may be set off." The statute refers only to relations between contracting parties; the statute does not give either party a right of setoff superior to the right of a secured third party. Sterling's security agreement covering inventory is effective against a creditor like Southwire with its claim on a contract. Off.Code Ga.Ann. sec. 11–9–201 (1982).

If Southwire is attempting to argue that it has some form of processor's or mechanic's lien superior to Sterling's interest, the Georgia Code has a simple answer. Section 11–9–310 states that, except as expressly provided to the contrary, a perfected security interest takes priority over all the liens described in section 44–14–320, which does establish a lien in favor of mechanics on real and personal property. Off.Code Ga. Ann. sec. 11–9–310; sec. 44–14–320 (1982).

Southwire also contends that it has a right to setoff created by the U.C.C. itself. Section 9–318(1)(a) states in part:

> [T]he rights of an assignee are subject to all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom;

Off.Code Ga.Ann. sec. 11–9–318(1)(a) (1982). Appellant argues that Sterling was merely an assignee of an account; that Sterling's

rights are subject to the terms of the contract between Southwire and Metric, respectively, the account debtor and the assignor; and that Southwire had a setoff right by those terms.

" 'Account' means any right to payment for goods sold or leased for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." Off.Code Ga.Ann. sec. 11–9–106 (1982). Thus, for example, the tolling charges did constitute an account, Southwire had a right to payment for services rendered. On that "account," Metric was the "account debtor," the person who owes payment or other performance. However, the copper cathode itself did not constitute an "account," although it was "accounted for"—kept track of on Southwire's books. Rather, the copper cathode constituted goods in inventory, as a finished product covered by the same inventory financing statement that covered the scrap copper, the initial form of the goods which were converted into cathode. Section 9–318 regards assigned accounts, chattel paper or contract rights, not assigned goods in inventory as defined in Off. Code Ga.Ann. sec. 11–9–109(4). *See* U.C.C. sec. 9–318 Official Code Comment 1.

The cases cited by Southwire as examples of application of this section of the Code involve only accounts. *Michelin Tires (Canada) Ltd. v. First National Bank of Boston,* 666 F.2d 673 (1st Cir.1981) (assignment of accounts receivable); *James Talcott, Inc. v. H. Corenzwit & Co.,* 76 N.J. 305, 387 A.2d 350 (1978) (assignment of accounts receivable for toy sales); *In re Chase Manhattan Bank v. New York,* 48 A.D.2d 11, 367 N.Y. S.2d 580, 582–84 (1975) (assignment of accounts receivable); *Daly v. Shrimplin,* 610 P.2d 397 (Wyo.1980) (assignment of accounts receivable).

Within the scheme of the U.C.C., it is only reasonable that section 9–318 would not apply to assignment of a security interest in goods in inventory. Otherwise, in the present case, the mechanic's or processor's lien on goods, discussed above, would indeed take priority over the secured interest, which, as noted, section 11–9–310 expressly provides it cannot do. A mechanic or processor would simply argue that he had an account owing for services rendered and then set off the value of the goods he had processed against his charge.

Finally, we note that the district court, having determined that the setoff was not authorized by the security agreement, further determined that it was not "otherwise" authorized. Off.Code Ga.Ann. sec. 11–9–306(2) (1982). The district court correctly determined that there was no implicit or explicit authorization of the setoff. This type of transfer between Metric and Southwire had never occurred previously, nor was it subsequently ratified by Sterling.

AFFIRMED.