MOFFAT COUNTY STATE
BANK, Plaintiff,

v.

PRODUCERS LIVESTOCK MARKET-
ING ASSOCIATION, Defendant.

No. 82–C–1763.

United States District Court,
D. Colorado.

Dec. 17, 1984.

Gregory L. Williams, Rothgerber, Appel
& Powers, Denver, Colo., for plaintiff.

William D. Meyer, Boulder, Colo., for defendant.

## ORDER

CARRIGAN, District Judge.

The plaintiff, Moffat County State Bank (the "Bank"), a Colorado corporation, sued Producers Livestock Marketing Association ("Producers"), a livestock sale barn, claiming that Producers converted the Bank's property by selling at auction sixty-eight head of cattle for the account of Thomas E. Seewald which were subject to the Bank's perfected security interest. Producers is a Utah corporation doing business in Colorado. The Bank is claiming $20,313.00, the proceeds from the cattle sale, plus interest from the date of the sale. The Bank and Producers have filed cross motions for summary judgment. Producers has filed a third party complaint against Thomas E. Seewald but that complaint is not in issue here. Jurisdiction is founded on diversity. 28 U.S.C. § 1332(a).

The parties submitted Stipulated Facts and Exhibits setting forth all facts necessary to decide the summary judgment motions. Because there are no genuine issues of material fact, summary judgment is appropriate. Fed.R.Civ.P. 56. The essential facts are as follows:

On July 27, 1981, the Bank loaned $75,232.33 to Thomas E. Seewald of Maybell, Colorado. This loan combined a new advance and a rewriting of existing mature loans previously made to Seewald. Seewald was a cattle rancher in Moffat County, Colorado. To secure its loan, the Bank entered into a security agreement with Seewald designating as collateral certain farm equipment, seventy-nine head of cattle and four horses. The cattle were identified by number, sex, age and brand.

Section 2 of the security agreement provides that the Bank holds a security interest in the listed property "together with all additions, accessions, replacements, substitutions, proceeds and products therefrom including natural increase of livestock and any and all property of similar type or kind now owned or hereafter acquired by the debtor and used for either personal, family or household purposes; farming or ranching operations; or any business in which the debtor is or might be engaged."

Two other provisions of the agreement are relevant. Section 5(4) provides that the "Debtor shall at all times keep the collateral at [Maybell in Moffat County, Colorado] unless notice is given to the Secured Party in advance and the Secured Party consents in writing to the removal to another location." Section 6 provides that the "Debtor shall be in default under this Agreement upon the ... sale of any of the collateral...."

Because the Bank had entered into similar arrangements with Mr. Seewald in the past, a financing statement, listing the bank as secured party and Seewald as debtor, and covering "Machinery and Livestock," had been filed with the Clerk and Recorder of Moffat County in 1976. Neither the "proceeds" nor the "products" box of the financing statement was checked. Pursuant to the Uniform Commercial Code ("U.C.C."), as codified at Colo.Rev.Stat. § 4–9–403(2) (1984 Cum.Supp.), a financing statement is effective for five years from the date of filing. In anticipation of the execution of the July 27, 1981 security agreement, and pursuant to Colo.Rev.Stat. 4–9–403(3) (1984 Cum.Supp.), the Bank filed a Continuation Financing Statement with the Moffat County Clerk and Recorder on July 10, 1981.

On October 20 and 21, 1981, without the Bank's knowledge, Seewald sold sixty-eight head of cattle through Producers, a livestock sale barn in Greeley, Colorado. Prior to sale, the cattle were inspected by a Colorado state brand inspector who certified compliance with the livestock bill of sale laws to Producers. According to Producers' sales records, it sold sixty-three head

of cattle for Seewald on October 20, 1981 for a gross sales price of $19,730.56, and five head of cattle on October 21, 1981 for a gross sales price of $1,837.33. The total net proceeds paid by Producers to Seewald for both sales, after deducting commissions and other sale expenses, was $20,313.00. Seewald warranted to Producers that all cattle were free from any liens and encumbrances. Producers made no inquiry and had no actual knowledge of the Bank's asserted security interest in the cattle. Seewald neither remitted any part of the proceeds to the Bank nor informed the Bank of the sale.

In January 1982, the Bank first learned, through an anonymous letter, that Seewald may have sold some of his cattle without informing the Bank or remitting the proceeds to the Bank. By letter of February 19, 1982, the Bank informed Seewald that he was in breach of the security agreement by diverting proceeds from the October 1981 cattle sales and by failing to apply that money to the note principal and interest at the Moffat County State Bank. After contacting public livestock markets across the state, the Bank discovered, in March 1982, that Producers had sold the cattle for Seewald in October 1981. Despite the Bank's repeated demands for payment, neither Seewald nor Producers has remitted to it any part of the proceeds.

In August 1982, the Bank foreclosed on the farm equipment listed in the security agreement. After applying the proceeds of that sale to Seewald's indebtedness, Seewald still owed the Bank approximately $35,000 plus accrued interest. On August 20, 1982, Seewald filed, in the United States Bankruptcy Court for the District of Colorado, a voluntary petition under chapter 7 of the Bankruptcy Code.

The course of dealing and course of performance between the Bank and Seewald with respect to sales of cattle other than the one in dispute are also relevant. Seewald was an agricultural loan customer at the Bank from 1974 through 1982. During that period, Seewald negotiated a number of agricultural loans to finance his cattle breeding operation. The Bank expected Seewald to repay his loans from the proceeds derived from the sale of cattle.

Although the Bank's security agreements with Seewald, including the July 1981 agreement, state that Seewald was required to obtain written consent from the Bank before selling any cattle collateral, the Bank did not transact business with its customers, including Seewald, in that manner. The relevant stipulated facts are as follows:

"14. On more than one occasion, [J. Ted Haddan, the Bank Vice-President] advised Seewald that he was permitted to sell his cattle collateral as he saw fit provided that he brought the proceeds from each sale promptly to the Bank, where Seewald and the Bank would discuss the disposition of such proceeds. This arrangement was applied by the Bank to most of its agricultural loan customers and is typical in the cattle industry.

15. The Bank did not require agricultural borrowers, including Seewald, to have proceeds' checks drawn payable to both the borrower *and* the Bank, unless the borrower was in default or had otherwise given the Bank cause for concern. Such restriction was not placed on Seewald.

16. In practice, the Bank did not require Seewald or other agricultural borrowers to obtain written consent from the Bank to transport or sell cattle collateral before such transportation or sale. There were two reasons this was not required: (1) requiring written consent would have created an administrative burden for the Bank; and (2) the Bank trusted Seewald and its other agricultural borrowers to bring in the proceeds after any sale.

26. Prior to October 1981, the Bank's policy generally required the loan officer

to field inspect collateral for loans once per year, time permitting. The Seewald collateral was inspected on April 28, 1979 and January 30, 1982 by Haddan. More frequent inspections were not performed due to Haddan's lack of time to perform same.

32. In addition to the October 1981 sales by Seewald at Producers' market, the Bank is aware of cattle sales by Seewald on or about March 9, 1977, June 30, 1977, October 14, 1977, January 10, 1978, October 20, 1980, and December 10, 1981. On none of these occasions did Seewald request specific pre-sale permission from the Bank to sell some of his cattle.

38. If Seewald had brought the proceeds from the October 1981 sales at Producers in to the Bank within a few days after those sales, the Bank would not have considered Seewald in breach of his promissory note or security agreement with respect to those sales."

This is a diversity case. Because all events relevant to the dispute occurred in Colorado, Colorado law governs.

Two issues must be resolved:

A. Did the Bank perfect a security interest in the cattle sold by Producers?

B. Did the Bank authorize sale of the cattle and thus lose its security interest in the collateral under Colo.Rev.Stat. § 4–9–306(2) (1984 Cum.Supp.)?

If the Bank perfected its security interest in the cattle sold by Producers and did not authorize the sale of the cattle, Producers is liable to the Bank for converting the cattle. On the other hand, if the Bank failed to perfect its security interest in the cattle or authorized the sale by Producers, the Bank must bear the loss for Seewald's breach of the security agreement.

The applicable Colorado law is clear and undisputed:

"An auction company that sells property in behalf of another who holds the property subject to a perfected security interest, and the purchaser thereof, are each liable to the holder of the security interest for the fair value of the property sold, regardless of whether the auction company purchaser had actual knowledge of the existence of the security interest or the other's want of authority to sell, in the absence of facts showing acquiescence or consent on the part of the holder of the security interest." *Colorado Bank and Trust Company v. Western Slope Investments, Inc.*, 36 Colo.App. 149, 539 P.2d 501, 504 (1975).

This dispute arises because of the farm products exception to the protection of good faith purchasers rule of the Uniform Commercial Code. Section 9–307(1) of the Code, Colo.Rev.Stat. § 4–9–307(1) (1973), provides:

"A buyer in ordinary course of business (subsection (9) of section 4–1–201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

It is undisputed that the cattle sold by Producers were farm products and that Seewald was a person engaged in farming operations. It is similarly undisputed that Producers was a buyer in the ordinary course of business.

## A. *Did the Bank Perfect a Security Interest in the Cattle?*

The perfection of a security interest is governed by Article 9 of the Uniform Commercial Code, as adopted in Colorado at Colo.Rev.Stat. §§ 4–9–101 *et seq.* (1973). The Bank argues that it took every step required by the U.C.C. to perfect its security interest in the cattle.

Producers rests on three grounds in asserting that the Bank failed to perfect a security interest in the cattle it sold for

Seewald. First, the Bank inadequately described the livestock in the security agreement. Second, the Bank inadequately described the livestock in the financing statement. Third, the Bank acquired no interest in the cattle because it did not execute a bill of sale for the cattle nor did it take and record an assignment of the cattle brand in compliance with the livestock bill of sale laws, Colo.Rev.Stat. §§ 35–54–101 *et seq.* (1984).

### 1. *Adequacy of description in the security agreement.*

The security agreement identifies the livestock collateral as follows:

"71 cows and calves
1 2yrs heifer
3 yearling (2 steers & 1 heifer)
4 bulls
4 horses

Branded thus (5)
〵≤ "

In addition to the itemized livestock, the security agreement also extended to "all additions, accessions, replacements, substitutions, proceeds and products therefrom including natural increase in livestock and any and all property of similar type or kind now owned or hereafter acquired by the Debtor and used for either personal, family or household purposes; farming or ranching operation; or any business in which the Debtor is or might be engaged."

Colo.Rev.Stat. § 4–9–110 (1973) sets forth the statutory standard for description of collateral in a security agreement:

"For the purposes of [Article 9 of the U.C.C.], any description of personal property is sufficient if it specifically identifies and itemizes in the security agreement what is described as to consumer goods, and *whether or not it is specific if it reasonably identifies what is described* as to all other personal property." (emphasis added)

Producers asserts that, in Colorado, a description "reasonably identifies" livestock only if it meets the requirements of the livestock bill of sale laws, Colo.Rev. Stat. §§ 35–54–101 *et seq.* (1984). Colo. Rev.Stat., § 35–54–101 provides, in pertinent part, that a duly executed bill of sale must describe the animal by sex, age, breed, brands or earmarks, wattle or dewlap, and horned or dehorned. The description of livestock in the security agreement is admittedly not this specific.

Producers' assertion is incorrect. The collateral description requirements of Article 9 of the U.C.C. are not supplemented by the livestock bill of sale laws. The statutory schemes serve different purposes. The livestock bill of sale laws provide a method to transfer *title* to livestock, while Article 9 provides for the creation and perfection of *security interests* in personal property, including cattle.

The livestock bill of sale laws were clearly designed to prevent rustling. *Cugnini v. Reynolds Cattle Co.*, 648 P.2d 159 (Colo. App.1981), *aff'd*, 687 P.2d 962 (1984). The bill of sale accompanying transfer must be sufficiently specific to identify a particular animal. This law is addressed to one specific problem—rustling—and does not address the distinct problem of notifying prospective buyers of security interests in the livestock. There is no provision in the livestock bill of sale laws for creating and recording a security interest; the only mechanism for this purpose is that set forth in Article 9 of the U.C.C.

The description of the collateral in the security agreement was adequate to give the bank a valid security interest in all cattle owned by Seewald. The description "reasonably identifies" what is described. Colo.Rev.Stat. § 4–9–110 (1973). That is all that is required.

### 2. *Adequacy of description in the financing statement.*

■ On November 26, 1976, the Bank filed a financing statement with the Moffat County Clerk and Recorder which identified the collateral as "machinery and livestock." Colo.Rev.Stat. §§ 4–9–401 and 402 (1984 Cum.Supp.). Neither the "products" nor the "proceeds" box was checked. On July 10, 1981, the Bank filed a continuation

statement in accordance with Colo.Rev. Stat. § 4–9–403(3) (1984 Cum.Supp.). Producers argues that the Bank only perfected a security interest in the cattle specifically enumerated in the security agreement because it failed to check the "products" of collateral box.[1] This argument is without merit.

A financing statement "is sufficient if it ... contains a statement indicating the types ... of collateral." Colo.Rev.Stat. § 4–9–402(1) (1984 Cum.Supp.). Subsection 4–9–402(8) (1984 Cum.Supp.) further provides that "[a] financing statement substantially.complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." The Fifth Circuit has held, on facts nearly identical to those at issue here, that the simple description "livestock" is sufficient under U.C.C. § 9–402 (Colo.Rev.Stat. § 4–9–402) to cover natural increases and other additions even in the absence of a specific indication on the financing statement. *United States v. Southeast Mississippi Livestock Farmers Association*, 619 F.2d 435 (5th Cir.1980). In that case, the court explained:

> "Official Comment (2) to § 9–402 of the UCC states that a financing statement is intended to be a system of 'notice filing' and nothing more:

>> What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose.the complete state of affairs."

619 F.2d at 439.

The court's conclusion in *Southeast Mississippi* is equally true in this case: "Certainly, any reasonable party examining the financing statements describing [Seewald's] collateral would have been sufficiently alerted to direct an inquiry to the [Bank] to determine what, if any, security interest in the livestock was held by the [Bank]."

It is arguable whether, to be technically correct, the Bank should have checked the "products" box; the security agreement explicitly covered the enumerated livestock "together with all additions, accessions, etc." Regardless, had Producers consulted the financing statement, the Bank's failure to check the box would not have been "seriously misleading." Colo.Rev.Stat. § 4–9–.402(8) (1984 Cum.Supp.).

3.  *Failure to comply with the livestock bill of sale laws, Colo.Rev.Stat. §§ 35–54–101 et seq. (1984).*

■ The Bank was not required to execute a bill of sale under Colo.Rev.Stat. § 35–54–101 nor to take an assignment of Seewald's brand, as Producers asserts, when it took a security interest in Seewald's cattle. As explained above, the livestock bill of sale laws govern passage of *title* in livestock. The livestock bill of sale laws supplement *Article 2* of the U.C.C. as codified in Colorado, Colo.Rev.Stat. §§ 4–2–101 *et seq.*, and, to the extent they are inconsistent with Article 2, supercede it. *See Cugnini v. Reynolds Cattle Co.*, *supra.* They do not, however, supplement or supercede Article 9 as Producers asserts.

In sum, therefore, I find and conclude that the Bank did perfect a security interest in the cattle Producers sold for Seewald.

B.  *Did the Bank authorize sale of the cattle and thus lose its security interest?*

■ The second issue is whether the Bank authorized the sale of cattle and thus

---

**1.** In 1977, the U.C.C. was amended to provide that a security interest in collateral automatically continues in identifiable cash proceeds provided that the financing statement covers the original collateral. Colo.Rev.Stat. § 4–9–306(3)(b) (1984 Cum.Supp.). It thus became unnecessary to check a box on each financing statement in order to perfect a security interest in identifiable cash proceeds. The Bank's failure to check the proceeds box in 1976 was thus without significance when the cattle were sold in 1981.

lost its security interest in the collateral. Colo.Rev.Stat. §§ 4–9–306(2) (1984 Cum. Supp.) provides:

"Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof *unless the disposition was authorized by the secured party* in the security agreement *or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (emphasis added)

The Bank argues that the security agreement did not authorize sale of the cattle and that that agreement governs. It relies on *Colorado Bank & Trust Co. v. Western Slope Investments, Inc., supra,* 539 P.2d 501, where the court rejected an auction company's waiver defense and held that the company was liable for conversion for selling cattle subject to a security interest held by the plaintiff bank. There the security agreement had prohibited sale of the collateral without prior written consent from the bank, but the bank's loan officer testified at trial that "he had never required a customer to get written approval before the sale of collateral, and that he generally relied upon the honesty of the customer to deliver the proceeds to the bank from such sales." 539 P.2d at 503. On appeal, the court held that this testimony could not support the auction company's waiver defense because when a "usage of trade" is inconsistent with the express terms of the security agreement, the express terms control. Colo.Rev.Stat. §§ 4–1–205(2) and (4) (1973).

In the instant case, however, there is evidence of waiver not only from a "course of dealing" or "usage of trade," but also from the "course of performance" between the parties. Pursuant to Colo.Rev.Stat. § 4–2–208(3) (1973), a "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

The Bank argues that its authorization, if any, was conditioned on Seewald's remitting the proceeds to it, and that Seewald's failure to perform this condition subsequent rendered its consent inoperative. This argument is without merit. The Bank's authorization, if any, was unaffected by Seewald's failure to remit the proceeds of the sale. The Tenth Circuit addressed this issue in *First National Bank and Trust Company of Oklahoma City v. Iowa Beef Processors, Inc.,* 626 F.2d 764, 769 (10th Cir.1980), where it stated:

"Consent to sell in the debtor's own name 'provided' the seller remits by its own check to the bank is not a true conditional sales authorization. In essence, such a condition makes the buyer an insurer of acts beyond its control. The bank has made performance of the debtor's duty to remit proceeds to the bank a condition of releasing from liability a third party acting in good faith. IBP could not ascertain in advance whether this condition would be met, as it could if a condition precedent was involved; nor did IBP have any control over the performance of the condition, as long as it paid [the debtor]. A secured party has an interest in protecting its security by conditioning its consent, but it can place conditions that would afford it protection without great unfairness to the good faith purchaser."

The Bank's reliance on *Southwest Washington Production Credit Association v. Seattle-First National Bank,* 92 Wash.2d 30, 593 P.2d 167 (1979), is misplaced. In that case, the court held that a security interest continued in collateral sold by debtors with consent of the secured party (on condition the debtors remitted the proceeds to the credit association) when the *buyer* failed to pay the debtors who were then unable to remit the proceeds to the credit association. In that situation there was no unfairness in continuing the security interest because the party liable, the buyer, controlled fulfillment of the condition. In contrast, here Producers, the buyer, paid Seewald, the debtor, for the cattle. It was the debtor who failed to pay the Bank, as in the *Iowa Beef Processors* case.

Finally, the Bank argues that it did not authorize or waive its security interest in the cattle because it did not voluntarily and intentionally relinquish a known right. *Security National Bank v. Belleville Livestock Commission Co., Inc.*, 619 F.2d 840, 846 (10th Cir.1979). Although one of the purposes of the Uniform Commercial Code is "to make uniform the law among the various jurisdictions," Colo.Rev.Stat. § 4–1–102(2)(c) (1973), courts have split widely on the question whether the secured party authorized sale of the collateral or waived its security interest in the collateral given very similar fact situations. The fact that so many cases have addressed this issue indicates that the same problem has arisen again and again in farming and ranching communities across the country.

While the security agreement normally prohibits disposition of the collateral without prior written consent from the secured party, the secured party usually does not, in practice, insist upon that written consent. The reason for the practice expressed by the Moffat County State Bank is typical. It would be administratively burdensome to provide a written consent for each sale of collateral. Rather, the Bank relies on the honesty of its agricultural borrowers to bring in the proceeds after a sale of collateral.

Banks and credit associations normally comply with the notice-filing provisions of Article 9 of the U.C.C. as the Bank did here. However, it appears from the numerous reported cases that livestock auction companies and other livestock purchasers often (and perhaps ordinarily) do not make inquiry to determine whether the livestock are subject to a security interest. Producers argued here that to require such an inquiry would be too burdensome; typically, a livestock sale barn auctions hundreds, if not thousands, of animals every day and cannot easily telephone each county clerk to check for financing statements, then place a follow-up call to each secured party to determine whether the animals are collateral and whether consent has been given for the sale.

The leading cases on the issue of authorization and waiver are *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967) (holding that the secured party waived its security interest in the collateral cattle),[2] and *Garden City Production Credit Association v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971) (holding that the secured party did not waive its security interest in the collateral cattle).

In the *Clovis* line of cases, the courts have characterized the secured party's conduct as express waiver or express consent and have held that the secured party's authorization of the sale releases the auction company or other purchaser from liability to the secured party. *First National Bank and Trust Company of Oklahoma City v. Iowa Beef Processors, Inc., supra*, 626 F.2d 764; *Security National Bank v. Belleville Livestock Commission Co., Inc., supra*, 619 F.2d at 846–48 (finding no implied waiver but finding express consent); *Ottumwa Production Credit Association v. Keoco Auction Co.*, 347 N.W.2d 393 (Iowa 1984); *Lisbon Bank and Trust Co. v. Murray*, 206 N.W.2d 96, 99 (Iowa 1973); *North Central Kansas Production Credit Association v. Washington Sales Co.*, 223 Kan. 689, 577 P.2d 35 (1978) (finding no implied waiver but finding express consent); *Anon, Inc. v. Farmers Production Credit Association of Scottsburg*, 446 N.E.2d 656 (Ind.App.1983). A persuasive rationale for this result is that "the secured party is in a much better position to protect itself than the buyer because he knows of the debtor and the origin of the product. The buyer, sometimes at remote distances, does not have this knowledge. Therefore, the loss is cast upon the secured party." *Anon, Inc., supra*, 446 N.E.2d at 660.

*Lannan* and its progeny, on the other hand, have characterized the secured party's conduct as a mere failure to object or

---

**2.** In 1968, New Mexico, by statute, set aside the *Clovis* rule. N.Mex.Stat.Ann. §§ 55–1–205(3) and (4) (1978).

rebuke the debtor for selling without written consent and have held that such mere inaction does not constitute a waiver. *Security National Bank v. Belleville Livestock Commission Co., Inc., supra* (finding no implied waiver from bank's failure to object but finding express consent to sale); *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 251 N.W.2d 321, 323 (1976) (*see* cases there cited from both the *Clovis* and *Lannan* lines of cases); *First Tennessee Production Credit Association v. Gold Kist, Inc.*, 653 S.W.2d 418 (Tenn.Ct.App.1983). An important policy rationale underlying these holdings is to facilitate the granting of credit to the capital-intensive agricultural industry. *North Central Kansas Production Credit Association v. Washington Sales Co., supra*, 577 P.2d at 41.

While I find little distinction in the operative facts between cases where courts have found express consent and others where courts have found only failure to object not amounting to waiver, I must attempt to apply these precedents to the facts here presented. I find that the Moffat County State Bank expressly consented to Seewald's sale of cattle. The Bank expected Seewald to sell his cattle in order to repay his loans. Its vice-president had advised Seewald on more than one occasion that he could sell his cattle collateral as he saw fit provided Seewald promptly brought the proceeds from each sale to the Bank. Stipulation 14. If Seewald had brought the sale proceeds check to the Bank within a few days following the October 1981 sales by Producers, the Bank would not have considered Seewald in default under the promissory note and security agreement. Stipulation 38. It is apparent that the event of default was Seewald's failure to remit the proceeds from the sale, not the sale itself.

As the Tenth Circuit stated in *First National Bank and Trust Co. of Oklahoma City v. Iowa Beef Processors, supra*, 626 F.2d at 767–68:

"The reality of cattle financing arrangements is that the secured party expects and wants the collateral to be sold continually in order for it to receive payment on the line of credit it has extended. At the same time, however, the secured party is reluctant to give blanket consent to the sales because it would lose its right to go against the purchaser should the debtor default. Consequently, secured parties in this area have tried to protect themselves by placing conditions on sales authorizations."

The court found, however, that consent conditioned on the debtor remitting the proceeds to the bank was not a true conditional sales authorization, as discussed above. The court went on to conclude as follows:

"[T]he policy of the Uniform Commercial Code to promote ready exchange in the marketplace, *see Riverside Nat'l Bank v. Law*, 564 P.2d 240, 243 (Okl.1977), outweighs the secured party's interest in the collateral under these circumstances. Therefore, we hold that even though the secured party conditions consent on receipt of the proceeds, failure of this condition will not prevent that consent from cutting off the security interest under section 9–306(2)." 626 F.2d at 769.

Producers admittedly did not check the Moffat County records to determine whether the cattle were subject to a security interest but this failure is irrelevant because the Bank gave Seewald actual authority to sell. Even if Producers had checked the Moffat County records and, finding a financing statement, telephoned the Bank, it presumably would have been told that Seewald was authorized to sell his cattle and accept proceeds in his own name as long as he brought the proceeds to the Bank. *See First National Bank and Trust Company of Oklahoma City v. Iowa Beef Processors, supra*, 626 F.2d at 768.

The tension in the law on the issue of the buyer's liability when the debtor pockets the proceeds from the sale of livestock collateral, as evidenced by divergent case law results on facts apparently indistinguishable in all material respects, arises because the Uniform Commercial Code's

treatment of security interests in livestock does not reflect the actual practice in the trade.

Section 9–307 of the U.C.C., Colo.Rev. Stat. § 4–9–307 (1973), provides that "[a] buyer in the ordinary course of business ... *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." (emphasis added) A number of states have amended this provision to distribute more equitably the rights and responsibilities of lenders holding security interests in livestock, and livestock buyers, including auction companies. *See* 3 Uniform Laws Annotated Master Ed., Uniform Commercial Code § 9–307 (1984 Cum.Annual Pocket Part), reporting Illinois, Nebraska, North Dakota, Ohio, Indiana and Tennessee amendments.

In Ohio, for example, a buyer of farm products in the ordinary course of business takes free of a perfected security interest unless the secured party sends written notice to the buyer before the sale that it claims a security interest in certain described farm products. The secured party may request the debtor to provide a written list of its potential buyers. If the secured party does request such a list, the debtor may not sell farm products to a buyer who does not appear on the list without the prior written consent of the secured party. This system protects both the secured party and the buyer of farm products without unduly burdening either party. The debtor can readily furnish the secured party a list of the sale barns and major purchasers with whom he or she normally transacts business. The secured party can then send a simple notice to each listed purchaser. Each auction company or other purchaser would then maintain its own filing system and could quickly check its own records, when a load of livestock comes in, to determine whether it should make the proceeds check payable only to the seller or jointly to the seller and the secured party.

While other schemes could, of course, be devised, the Ohio legislation illustrates that the Colorado legislature holds the solution to the problem brought to this court by the Bank and Producers. Until the legislature acts, courts will continually be placed in the position of choosing between two innocent parties on the basis of such ill-defined and difficult to apply distinctions as failure to rebuke versus express consent. The resultant uncertainty will continue to spawn litigation in contravention of the policies of the Uniform Commercial Code.

Accordingly,

IT IS ORDERED that summary judgment is granted in favor of defendant Producers Livestock Marketing Association and against plaintiff Moffat County State Bank.